Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
Michael Vanunu, Esq.
Philip P. Nash, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance Company,*
*GEICO Indemnity Company, GEICO General Insurance Company*
*and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY and
GEICO CASUALTY COMPANY,

                                      Plaintiffs,

             -against-

ALL CITY MEDICAL SUPPLY INC., EASY WAY
MEDICAL SUPPLY INC., IRBO MEDICAL SUPPLY
INC., RGV MEDICAL EQUIPMENT CORP., SOAN
MEDICAL SUPPLY CORP., XL MEDICAL SUPPLY
INC., LEONID KAPLAN, OLEG SATANOVSKYY,
IRINA BOGDANOVA, NIKOLAY ROGOV, SHAHID
ISHAQ, SVETLANA KLETSOVA, and JOHN DOE
DEFENDANTS "1" through "10",

                                    Defendants.
-----------------------------------------------------------------X

Docket No.:_____ (    )

**Plaintiff Demands a Trial by Jury**

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO

General Insurance Company and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

## INTRODUCTION

1.      GEICO brings this action to recover more than $761,000.00 that Defendants have wrongfully obtained from GEICO by submitting and causing to be submitted thousands of fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise non-reimbursable durable medical equipment ("DME") and orthotic devices ("OD") (e.g. cervical collars, lumbar-sacral supports, orthopedic pillows, car seat cushions, massagers, electronic heat pads, egg crate mattresses, etc.) (collectively, the "Fraudulent Equipment") through a series of companies known as All City Medical Supply Inc. ("All City Supply"), Easy Way Medical Supply Inc. ("Easy Way Supply"), Irbo Medical Supply Inc. ("Irbo Supply"), RGV Medical Equipment Corp. ("RGV Equipment"), Soan Medical Supply Corp. ("Soan Supply"), and XL Medical Supply Inc. ("XL Supply")(collectively, the "DME Providers").  The DME Providers are all New York corporations that at various points in time have dispensed DME to persons who were allegedly involved and injured in automobile accidents and were eligible for coverage under no-fault insurance policies issued by GEICO ("Insureds").

2.      This array of companies are purportedly owned by Leonid Kaplan ("Kaplan"), Oleg Satanovskyy ("Satanovskyy"), Irina Bogdanova ("Bogdaova"), Nikolay Rogov ("Rogov"), Shahid Ishaq ("Ishaq"), and Svetlana Kletsova ("Kletsova")(collectively, the "Paper Owner Defendants"), who, in conjunction with others not presently identifiable to GEICO, devised a scheme to obtain medically unnecessary prescriptions, including photocopied prescriptions, from healthcare providers working out of no-fault clinics in the New York metropolitan area (the "Referring Providers") through unlawful kickbacks and other financial incentives.  Once the prescriptions were secured, the Defendants then billed GEICO collectively more than $1.8 million, with each DME Provider making virtually identical fraudulent misrepresentations to GEICO concerning the

types of Fraudulent Equipment purportedly provided to Insureds and the maximum reimbursement rates they were entitled to receive.  As part of their scheme to avoid detection and extract money from GEICO, the Defendants shifted the billing submitted to GEICO from one DME Provider to the next over the course of several months.

3.      GEICO seeks to terminate this fraudulent scheme and recover more than $761,000.00 that has been wrongfully obtained by the DME Providers, the Paper Owner Defendants, and John Doe Defendants "1" – "10" (the "John Doe Defendants") (collectively, the "Defendants") since 2021 and, further, seeks a declaration that it is not legally obligated to pay reimbursement of more than $545,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of the DME Providers since 2021, because:

    (i)    The Defendants billed GEICO for Fraudulent Equipment when they were ineligible to collect No-Fault Benefits because they failed to comply with local licensing requirements;

    (ii)    The Defendants billed GEICO for Fraudulent Equipment purportedly provided to Insureds as a result of unlawful financial arrangements with others who are not presently identifiable;

    (iii)    The Defendants billed GEICO for Fraudulent Equipment that was not medically necessary and provided – to the extent actually provided – pursuant to prescriptions purportedly issued by the Referring Providers as a result of predetermined fraudulent protocols, which were solely to financially enrich the Defendants and others not presently known rather than to treat the Insureds;

    (iv)    The Defendants billed GEICO for Fraudulent Equipment that was provided – to the extent actually provided – as a result of decisions made by laypersons, not based upon prescriptions issued by the Referring Providers who are licensed to issue such prescriptions;

    (v)    To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted to GEICO by the Defendants fraudulently misrepresented the type and nature of the Fraudulent Equipment purportedly provided to Insureds as the Healthcare Common Procedure Coding System ("HCPCS") Codes identified in the bills did not accurately represent what was provided to Insureds; and

(vi)    To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted to GEICO by the Defendants fraudulently and grossly inflated the permissible reimbursement rate that the Defendants could have received for the Fraudulent Equipment.

4.    The Defendants fall into the following categories:

(i)    The DME Providers are New York corporations that purport to purchase DME and OD from wholesalers, purport to provide Fraudulent Equipment to automobile accident victims, and bill New York automobile insurance companies, including GEICO, for Fraudulent Equipment;

(ii)    Defendant Kaplan is listed on paper as the owner, operator, and controller of All City Supply when, as discussed below, Kaplan works for one of the John Doe Defendants who secretly controls and profits from all the DME Providers, and used All City Supply to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims;

(iii)    Defendant Satanovskyy is listed on paper as the owner, operator, and controller of Easy Way Supply, when, as discussed below, Satanovskyy works for one of the John Doe Defendants who secretly controls and profits from all the DME Providers, and used Easy Way Supply to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims;

(iv)    Defendant Bogdanova is listed on paper as the owner, operator, and controller of Irbo Supply, when, as discussed below, Bogdanova works for one of the John Doe Defendants who secretly controls and profits from all the DME Providers, and used Irbo Supply to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims;

(v)    Defendant Rogov is listed on paper as the owner, operator, and controller of RGV Equipment, when, as discussed below, Rogov works for one of the John Doe Defendants who secretly controls and profits from all the DME Providers, and used RGV Equipment to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims;

(vi)    Defendant Ishaq is listed on paper as the owner, operator, and controller of Soan Supply, when, as discussed below, Ishaq works for one of the John Doe Defendants who secretly controls and profits from all the DME Providers, and used Soan Supply to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims;

(vii)   Defendant Kletsova is listed on paper as the owner, operator, and controller of XL Supply, when, as discussed below, Kletsova works for one of the John Doe Defendants who secretly controls and profits from all the DME Providers, and used XL Supply to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims; and

(viii)  John Doe Defendants "1" - "10" (the "John Doe Defendants") are citizens of New York who are presently not identifiable but are: (i) secretly controlling and profiting from the DME Providers; (ii) associated with the Referring Providers and various multi-disciplinary medical offices that purportedly treat high-volume of No-Fault insurance patients (the "Clinics") and are the sources of prescriptions to the DME Providers; and/or (iii) conspired with the Paper Owner Defendants to further the fraudulent schemes against GEICO and other automobile insurers.

5.      As discussed below, Defendants have always known that the claims for Fraudulent Equipment submitted to GEICO were fraudulent because:

(i)     The bills for Fraudulent Equipment submitted by the Defendants to GEICO fraudulently misrepresented that the Defendants complied with all local licensing requirements when the Defendants were not lawfully licensed to provide the Fraudulent Equipment by the New York City Department of Consumer and Worker Protection (formerly Department of Consumer Affairs), as they misrepresented the ownership and business premises address for each of the DME Providers;

(ii)    The Fraudulent Equipment was provided – to the extent that any was provided – based upon illegitimate prescriptions, including photocopied prescriptions, received as a result of unlawful financial arrangements between the Defendants and others who are not presently identifiable and, thus, not eligible for no-fault insurance reimbursement in the first instance;

(iii)   The prescriptions for Fraudulent Equipment were not medically necessary and the Fraudulent Equipment was provided – to the extent actually provided – pursuant to predetermined fraudulent protocols designed by the Defendants and others not presently identifiable to GEICO, which was solely to financially enrich the Defendants and others not presently known, rather than to treat or otherwise benefit the Insureds;

(iv)    The Fraudulent Equipment was provided – to the extent actually provided – as a result of decisions made by laypersons, not based upon prescriptions issued by healthcare providers who are licensed to issue such prescriptions;

(v)     To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted by the Defendants to GEICO –

and other New York automobile insurers – fraudulently misrepresented the type and nature of the Fraudulent Equipment purportedly provided to the Insureds as the HCPCS Codes identified in the bills did not accurately represent what was actually provided to Insureds; and

(vi)    To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted by the Defendants to GEICO – and other New York automobile insurers – fraudulently and grossly inflated the permissible reimbursement rate that the Defendants could have received for the Fraudulent Equipment.

6.      As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Equipment billed to GEICO through the DME Providers.

7.      The charts attached hereto as Exhibits "1" through "6", set forth a representative sample of the fraudulent claims that have been identified to date that were submitted, or caused to be submitted, to GEICO pursuant to the Defendants' fraudulent scheme through All City Supply, Easy Way Supply, Irbo Supply, RGV Equipment, Soan Supply, and XL Supply.

8.      Though Defendants' fraudulent scheme against GEICO and the New York automobile insurance industry has been ongoing for many years, through this action GEICO seeks recovery in this action for claims with dates of service from January 2021 to the present, as the scheme has continued uninterrupted since that time.

9.      As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $761,000.00.

## THE PARTIES

**I.      Plaintiffs**

10.     Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company, are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is

authorized to conduct business and to issue policies of automobile insurance in the State of New York.

## II.     **Defendants**

11.     Defendant Kaplan resides in and is a citizen of New York and is listed as the paper owner of All City Supply.

12.     Kaplan is no stranger to No-Fault insurance schemes as he was indicted in 2011 and ultimately pled guilty in 2012 to Conspiracy to Commit Health Care Fraud in violation of 18 U.S.C. § 1347 for opening and operating medical clinics in Brooklyn and Queens, which, as Kaplan described during guilty plea allocution, "These clinics were actually medical fraud mills that bill insurance companies under the no-fault program for medical treatment that was not necessary.  The clinics paid the money to the patients for the treatment in the clinics. Then the medical supplies were distributed which were not necessary." See, U.S.A. v. Leonid Kaplan, et al., 1:11-cr-00892-RMB (S.D.N.Y 2011), ECF No. 1, ECF No. 120.

13.     Defendant All City Supply is a New York corporation with its principal place of business in Brooklyn, New York. All City Supply was incorporated on July 28, 2020, and is owned on paper and purportedly operated and controlled by Kaplan. In actuality, one of the John Doe Defendants secretly controls and profits from All City Supply and, with the aid of Kaplan, used All City Supply as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

14.     Defendant Satanovskyy resides in and is a citizen of New York and is listed as the paper owner of Easy Way Supply.

15.     Defendant Easy Way Supply is a New York corporation with its principal place of business in Staten Island, New York. Easy Way Supply was incorporated on January 5, 2022, and is owned on paper and purportedly operated and controlled by Satanovskyy. In actuality, one of

the John Doe Defendants secretly controls and profits from Easy Way Supply and, with the aid of Satanovskyy, used Easy Way Supply as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

16.     Defendant Bogdanova resides in is a citizen of Pennsylvania and is listed as the paper owner of Irbo Supply.

17.     Defendant Irbo Supply is a New York Corporation with its principal place of business in Staten Island, New York. Irbo Supply was incorporated on October 25, 2021, and is owned on paper and purportedly controlled and operated by Bogdanova. In actuality, one of the John Doe Defendants secretly controls and profits from Irbo Supply and, with the aid of Bogdanova, used Irbo Supply as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

18.     Defendant Rogov resides in and is a citizen of New York and is listed as the paper owner of RGV Equipment.

19.     Defendant RGV Equipment is a New York corporation with its principal place of business in Brooklyn, New York. RGV Equipment was incorporated on March 11, 2022, and is owned on paper and purportedly operated and controlled by Rogov. In actuality, one of the John Doe Defendants secretly controls and profits from RGV Equipment and, with the aid of Rogov, used RGV Equipment as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

20.     Defendant Ishaq resides in and is a citizen of New York and is listed as the paper owner of Soan Supply.

21.     Defendant Soan Supply is a New York corporation with its principal place of business in Brooklyn, New York. Soan Supply was incorporated on February 11, 2022, and is

owned on paper and purportedly operated and controlled by Ishaq. In actuality, one of the John Doe Defendants secretly controls and profits from Soan Supply and, with the aid of Ishaq, used Soan Supply as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

22.    Defendant Kletsova resides in and is a citizen of New York and is listed as the paper owner of XL Supply.

23.    Defendant XL Supply is a New York corporation with its principal place of business in Staten Island, New York. XL Supply was incorporated on September 14, 2022, and is owned on paper and purportedly operated and controlled by Kletsova. In actuality, one of the John Doe Defendants secretly controls and profits from XL Supply and, with the aid of Kletsova, used XL Supply as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

## JURISDICTION AND VENUE

24.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

25.    Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.  In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

26.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where a substantial amount of the activities forming the basis of the Complaint occurred, and where one or more of the Defendants reside.

**<u>ALLEGATIONS COMMON TO ALL CLAIMS</u>**

27.     GEICO underwrites automobile insurance in the State of New York.

**I.      <u>An Overview of the Pertinent Laws</u>**

    **A.      Pertinent Laws Governing No-Fault Insurance Reimbursement**

28.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

29.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, <u>et</u> <u>seq</u>.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, <u>et</u> <u>seq</u>.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

30.     In New York, No-Fault Benefits include up to $50,000.00 per Insured for medically necessary expenses that are incurred for healthcare goods and services, including goods for DME and OD. <u>See</u> N.Y. Ins. Law § 5102(a).

31.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "New York Fee Schedule").

32.     Pursuant to the No-Fault Laws, healthcare service providers are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

33.     For instance, the implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

34.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare service providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

35.     Title 20 of the City of New York Administrative Code imposes licensing requirements on healthcare providers located within the City of New York which engage in a business which substantially involves the selling, renting, repairing, or adjusting of products for the disabled, which includes DME and OD.

36.     Specifically, New York City's Administrative Code requires DME/OD suppliers to obtain a Dealer in Products for the Disabled License ("Dealer in Products License") issued by the New York City Department of Consumer and Worker Protection, formerly Department of Consumer Affairs, ("DCWP") in order to lawfully provide DME or OD to the disabled, which is defined as "a person who has a physical or medical impairment resulting from anatomical or physiological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques". See 6 RCNY § 2-271; NYC Admin. Code §20-425.

37.     It is unlawful for any DME/OD supplier to engage in the selling, renting, fitting, or adjusting of products for the disabled within the City of New York without a Dealer in Products License.  See NYC Admin. Code §20-426.

38.    A Dealer in Products License is obtained by filing a license application with the DCWP. The application requires that the applicant identify, among other pertinent information, the commercial address of where the DME/OD supplier is physically operating from.

39.    The license application for a Dealer in Products License also requires the applicant to affirm that they are authorized to complete and submit the application on behalf of the corporate entity seeking a license and that the information contained in the application is true, correct, and complete. The affirmation to the application requires a signature that is made under penalty for false statements under Sections 175.30, 175.35, and 210.45 of New York's Penal Law.

40.    New York law also prohibits licensed healthcare services providers, including chiropractors and physicians, from paying or accepting kickbacks in exchange for referrals for DME or OD. See, e.g., N.Y. Educ. Law §§ 6509-a, 6530(18), 6531; 8 N.Y.C.R.R. § 29.1(b)(3).

41.    Prohibited kickbacks include more than simple payment of a specific monetary amount, it includes "exercising undue influence on the patient, including the promotion of the sale of services, goods, appliances, or drugs in such manner as to exploit the patient for the financial gain of the licensee or of a third party". See N.Y. Educ. Law §§ 6509-a, 6530(17); 8 N.Y.C.R.R. § 29.1(b)(2).

42.    Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary goods and services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

43.     In the alternative, a healthcare service provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500" or "CMS-1500 form").

44.     Pursuant to Section 403 of the New York State Insurance Law, the NF-3 Forms submitted by healthcare service providers to GEICO, and to all other insurers, must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

45.     Similarly, all HCFA-1500 (CMS-1500) forms submitted by a healthcare service provider to GEICO, and to all other automobile insurers, must be verified by the healthcare service provider subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

**B.      Pertinent Regulations Governing No-Fault Benefits for DME and OD**

46.     Under the No-Fault Laws, No-Fault Benefits can be used to reimburse medically necessary DME or OD that was provided pursuant to a lawful prescription from a licensed healthcare provider. See N.Y. Ins. Law § 5102(a). By extension, DME or OD that was provided without a prescription, pursuant to an unlawful prescription, or pursuant to a prescription from a layperson or individual not lawfully licensed to provide prescriptions, is not reimbursable under the No-Fault Laws.

47.     DME generally consists of items that can withstand repeated use, and primarily consists of items used for medical purposes by individuals in their homes. For example, DME can

include items such as bed boards, cervical pillows, orthopedic mattresses, electronic muscle stimulator units ("EMS units"), infrared heat lamps, lumbar cushions, orthopedic car seats, transcutaneous electrical nerve stimulators ("TENS units"), electrical moist heating pads (known as thermophores), cervical traction units, and whirlpool baths.

48.     OD consists of instruments that are applied to the human body to align, support, or correct deformities, or to improve the movement of joints, spine, or limbs. These devices come in direct contact with the outside of the body, and include such items as cervical collars, lumbar supports, knee supports, ankle supports, wrist braces, and the like.

49.     To ensure that Insureds' $50,000.00 in maximum No-Fault Benefits are not artificially depleted by inflated DME or OD charges, the maximum charges that may be submitted by healthcare providers for DME and OD are set forth in the New York Fee Schedule.

50.     In a June 16, 2004 Opinion Letter entitled, "No-Fault Fees for Durable Medical Equipment", the New York State Insurance Department recognized the harm inflicted on Insureds by inflated DME and OD charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

51.     As it relates to DME and OD, the New York Fee Schedule sets forth the maximum charges as follows:

> (a)     The maximum permissible charge for the purchase of durable medical equipment… and orthotic [devices] . . . shall be the fee payable for such equipment or supplies under the New York State Medicaid program at the time such equipment and supplies are provided . . . if the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable, shall be the lesser of:

(1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts, or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or

(2) the usual and customary price charged to the general public.

See 12 N.Y.C.R.R. § 442.2 (2021).

52. As indicated by the New York Fee Schedule, up to April 4, 2022, payment for DME or OD is directly related to the fee schedule set forth by the New York State Medicaid program ("Medicaid").

53. According to the New York Fee Schedule, in instances where Medicaid has established a fee payable ("Fee Schedule item"), the maximum permissible charge for DME or OD is the fee payable for the item set forth in Medicaid's fee schedule ("Medicaid Fee Schedule").

54. For Fee-Schedule items, Palmetto GBA, LLC ("Palmetto"), a contractor for the Center for Medicare & Medicaid Services ("CMS"), was tasked with analyzing and assigning HCPCS Codes that should be used by DME and OD companies to seek reimbursement for – among other things – Fee Schedule items. The HCPCS Codes and their definitions provide specific characteristics and requirements that an item of DME or OD must meet in order to qualify for reimbursement under a specific HCPCS Code.

55. The Medicaid Fee Schedule is based upon fees established by Medicaid for HCPCS Codes promulgated by Palmetto.

56. Where a specific DME or OD does not have a fee payable in the Medicaid Fee Schedule ("Non-Fee Schedule item") then the fee payable by an insurer such as GEICO to the provider shall be the lesser of: (i) 150% of the acquisition cost to the provider; or (ii) the usual and customary price charged to the general public.

57.     For Non-Fee Schedule items, the New York State Insurance Department recognized that a provider's acquisition cost must be limited to costs incurred by a provider in a "bona fide arms-length transaction" because "[t]o hold otherwise would turn the No-Fault reparations system on its head if the provision for DME permitted reimbursement for 150% of any documented cost that was the result of an improper or collusive arrangement." See New York State Insurance Department, No-Fault Fees for Durable Medical Equipment, June 16, 2004 Opinion Letter.

58.     To the extent that bills for No-Fault Benefits are for Non-Fee Schedule items that are identified by HCPCS Codes, the definitions for set forth by Palmetto control to determine whether an item of DME or OD qualify for reimbursement under a specific HCPCS Code.

59.     Additionally, many HCPCS Codes relate to OD that has either been prefabricated, custom-fitted and/or customized. Palmetto published a guide to differentiating between custom-fitted items and off-the-shelf, prefabricated items, entitled, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised. As part of its coding guide, Palmetto has identified who is qualified to properly provide custom-fitted OD.

60.     The maximum reimbursement rates for providing DME or OD to automobile accident victims under the No-Fault Laws set forth above includes all shipping, handling, and delivery. See 12 N.Y.C.R.R. § 442.2(c). As such, DME/OD suppliers are not entitled to submit separate charges for shipping, handling, delivery, or set up of any DME or OD.

61.     In an effort to reduce the blatant fraud committed against insurers for abusive charges relating to DME, the New York State Workers' Compensation Board replaced the New York State Medicaid Program's Durable Medical Equipment Fee Schedule with a new New York

State Workers' Compensation Durable Medical Equipment Fee Schedule ("WC DME Fee Schedule") that became effective on April 4, 2022.

62.     Among other things, the WC DME Fee Schedule limited the reimbursement rates of certain previously abused DME charges. The changes made for the reimbursement for DME by the New York State Workers' Compensation Board are reflected in 12 N.Y.C.R.R. 442.2 (2022).

63.     Similarly, effective June 1, 2023, the New York State Department of Financial Services issued an amendment to 11 N.Y.C.R.R. 68, adding Part E of Appendix 17-C, to address No-Fault reimbursement for DME that is not specifically identified by the WC DME Fee Schedule.

64.     However, between the time period of April 4, 2022, and May 31, 2023, to address the vagueness of determining the reimbursement of No-Fault for certain changes not identified in the WC DME Fee Schedule, the New York State Department of Financial Services issued an emergency amendment explaining the standard for reimbursement when there is no price contained in the WC DME Fee Schedule.

65.     For all charges after April 4, 2022, as it relates to Non-Fee Schedule items that are provided by a DME/OD supplier, the maximum permissible reimbursement rate is the lesser of: (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or (2) the usual and customary price charged to the general public. See 11 N.Y.C.R.R. 68, Appendix 17-C, Part E.

66.     Accordingly, when a healthcare provider submits a bill to collect charges from an insurer for DME or OD using either a NF-3 or HCFA-1500 form, the provider represents – among other things – that:

> (i)     The provider is in compliance with all significant statutory and regulatory requirements;

17

(ii) The provider received a legitimate prescription for reasonable and medically necessary DME from a healthcare practitioner that is licensed to issue such prescriptions;

(iii) The prescription for DME or OD is not based any unlawful financial arrangement;

(iv) The DME or OD identified in the bill was actually provided to the patient based upon a legitimate prescription identifying medically necessary item(s);

(v) The HCPCS Code identified in the bill actually represents the DME or OD that was provided to the patient; and

(vi) The fee sought for DME or OD provided to an Insured was not in excess of the price contained in the applicable DME Fee Schedule (Medicaid Fee Schedule or WC DME Fee Schedule) or the standard used for a Non-Fee Schedule item.

## II. The Defendants' Fraudulent Scheme

### A. The DME Providers' Common Secret Ownership

67. The John Doe Defendants conspired with the Paper Owner Defendants to implement a fraudulent scheme in which the DME Providers were used consecutively and in conjunction with each other over the course of several years to bill GEICO and other New York automobile insurers for millions of dollars in No-Fault Benefits to which they were never entitled to receive.

68. While each of the DME Providers was formed and listed as being owned by one of the Paper Owner Defendants, all of the DME Providers were actually controlled by John Doe Defendant "1", who is not presently identifiable to GEICO (hereinafter, the "Secret Owner"), who also profited from the fraudulent scheme committed against GEICO and other New York automobile-insurers.

69. The Secret Owner was able to secretly control and profit from the DME Providers by using each of the Paper Owner Defendants as "straw" owners who would place their name on

documents needed to be filed with the State of New York and City of New York to lawfully operate the DME Providers.

70.     In keeping with the fact that the Secret Owner actually owned, controlled, and profited from the DME Providers, and used the Paper Owner Defendants to further the fraudulent scheme herein, there is significant overlap in the operations of the various DME Providers that could only exist through the Secret Owner's involvement.

71.     For example, each of the DME Providers issued thousands of dollars in checks to "Jagman Inc." and/or "4M Management", combining for over $120,000.00 in payments, which were all deposited into the Chase Bank account for Jagman Inc., a shell corporation owned by an individual by the name of Rodian Babaisakov ("Babaisakov").

72.     Babaisakov appeared for a non-party deposition on December 19, 2023 in connection with Gov't Emps. Ins. Co. v. Gary Grody, et al., 1-22-cv-06187-KAM-PK (E.D.N.Y. 2022) and was asked questions about these payments, including if these payments were received as part of a no-fault insurance scheme and money laundering operation.

73.     In response to these questions, Babaisakov asserted his Fifth Amendment privilege against self-incrimination.

74.     In further support of the fact that the Secret Owner owned, controlled, and profited from the DME Providers, and used the Paper Owner Defendants to further the fraudulent scheme, checks issued by the DME Providers to 4M Management contained the same handwriting except for the signature of the Paper Owner Defendants.  For example:

| | |
|---|---|
| All City Supply to 4M Management |  |
| Easy Way Supply to 4M Management |  |
| Irbo Supply to 4M Management |  |
| RGV Equipment to 4M Management |  |
| Soan Supply to 4M Management |  |
| XL Supply to 4M Management |  |

75.     Further, and in support of the fact that the Secret Owner controlled the DME Providers, checks were issued to Jagman Inc. on the same date by multiple DME Providers, despite having different Paper Owner Defendants:

| | |
|---|---|
| Easy Way Supply to Jagman Inc. dated September 11, 2022 |  |
| Irbo Supply to Jagman Inc. dated September 11, 2022 |  |
| Soan Supply to Jagman Inc. dated September 11, 2022 |  |

76.     In addition, an analysis of the billing submitted by the DME Providers reveals how the Secret Owner, together with the Paper Owner Defendants, limited the amount of billing submitted from any one of the DME Providers in an attempt to mask the common fraudulent scheme.

77.     As one or two of the DME Providers decreased their volume of billing to GEICO, another one or two of the other DME Providers increased their billing volume to GEICO to maintain a consistent amount billed to GEICO each month.

78.     The following chart illustrates how the Secret Owner shifted the billing submitted to GEICO between the DME Providers between June and October 2022:

| **Month** | **DME Provider** | **Total Billed** |
|---|---|---|
| **June 2022** | Easy Way Supply | $40,905.33 |
| | Irbo Supply | $28,651.20 |
| | RGV Equipment | $30,822.89 |
| | Soan Supply | $30,098.04 |

| | | Total | $130,477.46 |
|---|---|---|---|
| **July 2022** | Easy Way Supply | | $52,282.41 |
| | Irbo Supply | | $6,047.02 |
| | RGV Equipment | | $24,010.50 |
| | Soan Supply | | $30,159.47 |
| | | Total | **$112,499.40** |
| **August 2022** | Easy Way Supply | | $52,109.02 |
| | Irbo Supply | | $2,250.36 |
| | RGV Equipment | | $11,019.57 |
| | Soan Supply | | $59,542.90 |
| | | Total | **$124,921.85** |
| **September 2022** | Easy Way Supply | | $2,670.92 |
| | RGV Equipment | | $14,578.03 |
| | Soan Supply | | $107,358.62 |
| | | Total | **$124,607.57** |
| **October 2022** | RGV Equipment | | $21,516.38 |
| | Soan Supply | | $3,440.61 |
| | XL Supply | | $84,760.16 |
| | | Total | **$109,717.15** |

79.     Similarly, and as part of the common scheme, based on the unlawful financial arrangements between the Secret Owner, the Paper Owner Defendants, and others who are not presently identifiable but who are affiliated with the Clinics, the DME Providers each received virtually identical prescriptions for Fraudulent Equipment from multiple Clinics in the New York metropolitan area. For example:

(i)     All City Supply, Easy Way Supply, Irbo Supply, Soan Supply, and XL Supply each received virtually identical prescriptions for Fraudulent Equipment from the Clinic located at 1655 Richmond Ave., Staten Island, New York ("the Richmond Ave. Clinic");

(ii)     All City Supply, Easy Way Supply, Irbo Supply, Soan Supply, and XL Supply each received virtually identical prescriptions for Fraudulent Equipment from the Clinic located at 560 Prospect Ave., Bronx, New York; and

(iii)     All City Supply, Easy Way Supply, Irbo Supply, Soan Supply, and XL Supply each received virtually identical prescriptions for Fraudulent Equipment from the Clinic located at 488 Lafayette Ave., Brooklyn, New York.

80.     These are only representative examples.

81.     Further, as part of the On Paper and Secret Owners' efforts to mask the Secret Owner's control of the DME Providers, GEICO attempted to verify the claims submitted by the Defendants by way of examinations under oath, but the On Paper Defendants intentionally refused to appear, because they would be unable to answer key questions about the DME Providers' operations, and their testimony would reveal the secret ownership scheme.

82.     Additionally, and as discussed further below, the DME Providers each billed GEICO using virtually identical HCPCS Codes in response to the prescriptions from Fraudulent Equipment they received, and the DME Providers each made virtually the same coding misrepresentations in their billing to GEICO.

**B.      Overview of the Common Fraudulent Scheme**

83.      The Secret Owner, together with the Paper Owner Defendants, conceived and implemented a fraudulent scheme in which they used the DME Providers as vehicles to bill GEICO and other New York automobile insurers for millions of dollars in No-Fault Benefits that the Defendants were never entitled to receive.

84.     To maximize the amount of no-fault benefits the Defendants could receive, the Secret Owner along with the Paper Owner Defendants used the DME Providers in both simultaneous and sequential fashion to divide the billing that they were submitting to no-fault insurance carriers, including GEICO.

85.     In keeping with the fact that the Defendants split up their billing in order to maximize the amount of no-fault benefits they could collect, the DME Providers operated in

sequential order, typically with some overlap to allow more than one entity to bill no-fault insurance carriers, including GEICO, at a single time.

86.     Through the complex multi-corporation scheme, the Secret Owner and the Paper Owner Defendants used the DME Providers to bill and collect No-Fault Benefits from GEICO and other automobile insurers that they were never entitled to collect.  Specifically:

(i)     Between January 2021 and August 2021, All City Supply submitted more than $486,000.00 in fraudulent claims to GEICO, has wrongfully obtained more than $89,000.00, and there is more than $310,000.00 in additional fraudulent claims that have yet to be adjudicated but which the Defendants continue to seek payment of from GEICO;

(ii)    Between November 2021 and August 2022, Irbo Supply submitted more than $577,000.00 in fraudulent claims to GEICO, has wrongfully obtained more than $373,000.00, and there is more than $82,000.00 in additional fraudulent claims that have yet to be adjudicated but which the Defendants continue to seek payment of from GEICO;

(iii)   Between March 2022 and September 2022, Easy Way Supply submitted more than $148,000.00 in fraudulent claims to GEICO, has wrongfully obtained more than $85,000.00, and there is more than $59,000.00 in additional fraudulent claims that have yet to be adjudicated but which the Defendants continue to seek payment of from GEICO;

(iv)    Between April 2022 and February 2023, RGV Equipment submitted more than $140,000.00 in fraudulent claims to GEICO, has wrongfully obtained more than $60,000.00, and there is more than $69,000.00 in additional fraudulent claims that have yet to be adjudicated but which the Defendants continue to seek payment of from GEICO;

(v)     Between May 2022 and January 2023, Soan Supply submitted more than $237,000.00 in fraudulent claims to GEICO, has wrongfully obtained more than $67,000.00, and there is more than $149,000.00 in additional fraudulent claims that have yet to be adjudicated but which the Defendants continue to seek payment of from GEICO; and

(vi)    Between October 2022 and February 2023, XL Supply submitted more than $167,000.00 in fraudulent claims to GEICO, has wrongfully obtained more than $65,000.00, and there is more than $88,000.00 in additional fraudulent claims that have yet to be adjudicated but which the Defendants continue to seek payment of from GEICO.

87.     The Defendants were able to perpetrate the fraudulent scheme against GEICO described below by obtaining prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers because of improper agreements with third-party individuals associated with the Clinics who are not presently identifiable (the "Clinic Controllers").

88.     As part of this scheme, the Defendants obtained prescriptions for Fraudulent Equipment that were purportedly issued by various Referring Providers who purportedly treated Insureds at the various Clinics.

89.     As part of this scheme, the Defendants also obtained prescriptions for Fraudulent Equipment that were purportedly issued by the Referring Providers during their treatment at a Clinic.

90.     None of the Defendants marketed or advertised the DME Providers to the general public, and they lacked any genuine retail or office location, and operated without any legitimate efforts to attract patients who might need DME or healthcare practitioners who might legitimately prescribe DME.

91.     Similarly, the Paper Owner Defendants did virtually nothing that would be expected of the owner of a legitimate DME supply company to develop its reputation in the medical community or to attract patients who might need DME or healthcare practitioners who might legitimately prescribe DME.

92.     Instead, the Defendants entered illegal, collusive agreements with the Clinics, Clinic Controllers, and Referring Providers and steered them to prescribe and direct large volumes of the same prescriptions (or purported prescriptions) to the DME Providers for the specifically targeted Fraudulent Equipment.

93.     Defendants received the prescriptions for Fraudulent Equipment, purportedly issued by the Referring Providers as part of the unlawful financial arrangements with the Clinic Controllers, directly from the Clinics and without going through the Insureds, including prescriptions that were illegitimate and contained a duplicated signature of the Referring Provider who purportedly issued the prescription.

94.     As part of the scheme, and in a way to maximize the amount of money that the Defendants could obtain from GEICO, and other automobile insurers, the prescriptions for Fraudulent Equipment that were purportedly issued by the Referring Providers and provided to the Defendants were generic and vague.

95.     Once the Defendants received the prescriptions purportedly issued by the Referring Providers, the Defendants would submit either NF-3 or HCFA-1500 forms to GEICO seeking reimbursement for specific types of Fee Schedule and Non-Fee Schedule items with HCPCS Codes that were not directly identified in the prescriptions or that differed from the HCPCS Codes that were identified in the prescriptions.

96.     By submitting bills to GEICO seeking No-Fault Benefits for Fraudulent Equipment based upon specific HCPCS Codes, the Defendants indicated that they provided Insureds with the particular item associated with each unique HCPCS Code, and that such specific item was medically necessary as determined by a Referring Provider, who was licensed to prescribe DME and/or OD.

97.     However, the Defendants tried to maximize the amount of No-Fault Benefits that they could obtain from GEICO, and other automobile insurers, by submitting bills to GEICO for Fraudulent Equipment that was never actually provided to Insureds by misrepresenting the HCPCS Codes identified in the bills submitted to GEICO by the Defendants.

98.     In a substantial majority of the charges for Fee Schedule items identified in Exhibits "1" through "6" – to the extent that any Fraudulent Equipment was actually provided to the Insureds – the Fraudulent Equipment did not match the HCPCS Codes identified in the bills submitted to GEICO by the Defendants.

99.     Based on the false and medically unnecessary prescriptions, each of the Defendants engaged in a virtually identical pattern of submitting bills to GEICO, and other automobile insurers, seeking No-Fault Benefits based on HCPCS Codes that did not accurately represent – sometimes in any way – the Fraudulent Equipment purportedly provided to the Insureds in order to obtain higher reimbursement rates than what was permissible.

100.    Instead, the Fee Schedule items actually provided to Insureds – and again to the extent that any Fraudulent Equipment was actually provided – would qualify under different HCPCS Codes that had significantly lower maximum reimbursement rates than the HCPCS Codes identified in the bills submitted by the Defendants.

101.    In furtherance of their scheme to defraud GEICO and other automobile insurers, the Defendants also submitted bills for Non-Fee Schedule items that falsely indicated they were seeking reimbursement at the lesser of 150% of the Defendants' legitimate acquisition cost or the cost to the general public for the same item.

102.    In actuality, the bills from the Defendants submitted to GEICO for Non-Fee Schedule items contained grossly inflated reimbursement rates that did not accurately represent the lesser of 150% of the Defendants' legitimate acquisition cost or the cost to the general public.

103.    As a further part of this scheme, the Defendants submitted bills to GEICO with reimbursement rates that indicated the Non-Fee Schedule items purportedly provided to Insureds were expensive and high-quality, when the Fraudulent Equipment provided were cheap and poor-

quality, and were purchased from wholesalers for a small fraction of the reimbursement rates contained in the bills.

104.    In fact, the cheap and poor-quality Fraudulent Equipment provided to the Insureds – again, to the extent that any Fraudulent Equipment was actually provided – were easily obtainable from legitimate internet or brick-and-motor retailers for a small fraction of the reimbursement rates identified in the bills submitted to GEICO by the Defendants.

105.    After obtaining the vague and generic prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers as a result of paying various forms of consideration, the Defendants would bill GEICO through the different DME Providers for: (i) Fraudulent Equipment that was not reasonable or medically necessary; (ii) Fraudulent Equipment that was not based on valid prescriptions from licensed healthcare providers; (iii) Fraudulent Equipment that did not represent the HCPCS codes contained in the bills to GEICO; (iv) Fraudulent Equipment at grossly inflated reimbursement rates; and (v) Fraudulent Equipment that was otherwise not reimbursable.

106.    In an effort to hide the extent of their fraudulent acts against GEICO, the Defendants each also submitted multiple bills to GEICO for Fraudulent Equipment that was all purportedly delivered to Insureds' homes on the same date.

107.    The Defendants' submission of multiple bills to GEICO for Fraudulent Equipment was, in reality, designed to further mask the fraudulent scheme and an effort to keep the individual totals on each bill artificially lower and avoid detection by GEICO, when, to the extent that any Fraudulent Equipment was actually provided, the Insureds received the Fraudulent Equipment directly from the Clinics on a single date and without any involvement by the Defendants.

C.      **Defendants' Failure to Comply with Local Licensing Provisions**

108.    As stated above, for a DME/OD supplier to provide DME or OD to automobile accident victims within the City of New York, the DME/OD supplier must obtain a Dealer in Products License by the DCWP.

109.    For the Defendants to lawfully provide DME/OD to the Insureds identified in Exhibits "1" through "6", the DME Providers were required to obtain a Dealer in Products License because an overwhelming majority of the Insureds identified in Exhibits "1" through "6" were located within the City of New York.

110.    As part of the Defendants' scheme to defraud GEICO and other Insurers, the Defendants sought Dealer in Products Licenses from the DCWP in an effort to have almost all of the DME Providers appear to be legitimate.

111.    However, each of the DME Providers were not eligible to collect No-Fault Benefits from GEICO, and other automobile insurers, because they were never lawfully licensed by the DCWP to provide DME or OD to Insureds, because they obtained Dealer in Products licenses through fraud and/or misrepresentations.

112.    As part of obtaining a Dealer in Products License, each of the DME Providers, completed a license application form that required it to identify – among other things – the commercial address of where each physically operated from.

113.    Each Dealer in Products License application contains an affirmation to be signed with a penalty for false statements under Section 175.35 of New York's Penal Law.

114.    However, and in support of the fact that the Defendants' scheme to defraud GEICO and other automobile insurers of No-Fault Benefits, the Paper Owner Defendants each knowingly

provided false information in their Dealer in Products License applications filed on behalf of the DME Providers.

115.     In each of the applications for a Dealer in Products license completed by the Paper Owner Defendants on behalf of the DME Providers, the Paper Owner Defendants falsely affirmed that the DME Providers operated or conducted business from the address listed in the respective applications.

116.     In support of the fact that the Dealer in Products license applications contained false affirmations, GEICO investigators attempted to verify each of the premises addresses listed in the DME Providers' applications for a Dealer in Products License and was unable to confirm the operation of any of the DME Providers at their stated addresses, nor were any of these locations open to the public.

117.     For example, GEICO investigators attempted to verify the address of RGV Equipment in June 2022 and observed a locked storefront, bearing a sign for "Express Tax NYC, Riggy Multiservices, Serenity Promise Home Care Services".  Outside the front door of this locked business was a separate mailbox bearing the name "RGV Medical".  GEICO investigators spoke to neighboring businesses who stated they had not seen this storefront open for the last two years.

118.     Similarly, attempts to verify the address of Soan Supply, in July 2022, by GEICO investigators, revealed a shuttered storefront bearing signage for "Cyber Blake Networks".  Small lettering on the front window also bore the name "Soan Medical Supply", which was partially covered by the closed security gate.

119.     In addition, in August 2022, GEICO investigators attempted to verify the address of Easy Way Supply and observed no signage on the outside of the premises for the company. Upon proceeding through an open door and up a stairwell leading to "Cash Money Now

Pawnbrokers", GEICO investigators observed a locked door with a sign bearing the name "Easy Way Meical Supply", which misspelled the word "Medical".  GEICO investigators spoke with an employee of Cash Money Now Pawnbrokers who stated that they had never seen anyone enter or leave that office and that the sign misspelled the word "Medical".

120.    In further support of the fact that the DME Providers were not lawfully licensed by the DCWP because they obtained Dealer in Products licenses under false pretenses, each of the Paper Owners affirmed on their license applications, under penalty for false statements, that they were the sole owner of each respective DME Provider.

121.    In reality, as set forth above, the DME Providers were actually controlled by the Secret Owner, who directly profited from the fraudulent scheme committed through the DME Providers.

122.    The Paper Owners knowingly provided false information regarding their business addresses and ownership to induce the DCWP to issue licenses to them, which would give the Defendants the appearance of legitimacy and provide them with the opportunity to submit fraudulent billing to GEICO and other Insurers through the DME Providers.

123.    Accordingly, Defendants were never entitled to receive No-Fault Benefits because they failed to comply with all significant statutory and regulatory requirements by operating as a DME/OD supplier within the City of New York without a valid Dealer in Products License.

124.    In each of the claims identified in Exhibits "1" through "6", the Defendants knowingly misrepresented that they were properly licensed with all local statutory and regulatory requirements and were lawfully permitted to provide DME/OD to Insureds, when the Defendants were never eligible to collect No-Fault Benefits in the first instance, because the DME Providers

did not lawfully obtain Dealer in Products Licenses, because they received their Dealer in Products licenses under the false pretenses described above.

**D.     The Defendants' Unlawful Financial Arrangements**

125.     To obtain access to Insureds as part of the fraudulent scheme and maximize the No-Fault Benefits the Defendants could obtain from GEICO and other New York automobile insurers, the Defendants entered into unlawful financial agreements with others who are not presently identifiable but who are associated with the Clinics where prescriptions for Fraudulent Equipment were provided to the Defendants in exchange for financial consideration.

126.     Since the inception of the Defendants' fraudulent scheme, the Defendants engaged in unlawful financial arrangements with the Clinic Controllers to obtain prescriptions for Fraudulent Equipment. These schemes allowed the Defendants to submit thousands of claims for Fraudulent Equipment to GEICO and other New York automobile insurers in New York.

127.     As part of the unlawful financial arrangements, the Defendants would pay others, including the payments to "4M Management" and "Jagman Inc." described above, in addition to payments to other fictitious businesses which are not presently identifiable, to obtain prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers at the Clinics.

128.     The Defendants were able to enter unlawful financial arrangement schemes with the Clinic Controllers in order to obtain prescriptions purportedly issued by the Referring Providers, because the Referring Providers operated at Clinics that are actually organized as "one-stop" shops for no-fault insurance fraud.

129.     These Clinics provide facilities for the Referring Providers, as well as a "revolving door" of medical professional corporations, all geared towards exploiting New York's no-fault insurance system.

130.    In fact, GEICO has received billing from an ever-changing number of fraudulent healthcare providers at a variety of different Clinics that start and stop operations without any purchase or sale of a "practice", without any legitimate transfer of patient care from one professional to another, and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

131.    For example, GEICO has received billing from the Clinic located at 1655 Richmond Ave., Staten Island, New York, which was a source of prescriptions for Fraudulent Equipment for All City Supply, Easy Way Supply, and Irbo Supply, from a revolving door of more than 140 purportedly different healthcare providers.

132.    Similarly, GEICO received billing from at least 27 different healthcare providers that purported to operate out of the Clinic located at 172-17 Jamaica Ave., Jamaica, New York, which was a source of prescriptions for Fraudulent Equipment for RGV Equipment.

133.    Pursuant to the unlawful financial arrangements, the Defendants paid others associated with the Clinics but who are not presently known who were able to direct prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers to the Defendants, which the Defendants then used as a basis to support their fraudulent bills to GEICO.

134.    In keeping with the fact that the Clinics traded access to patients in exchange for kickbacks and other financial incentives, one of the Clinics from which the Defendants received prescriptions for Fraudulent Equipment is identified in United States of America v. Anthony Rose, et al., 19-cr-00789 (PGG)(S.D.N.Y. 2019) ("USA v. Rose") as being controlled by laypersons and as receiving patients as a result of illegal kickback and referral arrangements.  The Government affidavits unsealed in USA v. Rose include excerpts of wiretaps and other evidence indicating that,

among dozens of other locations, patients were steered to 488 Lafayette Ave., Brooklyn, New York – a layperson controlled Clinic where Referring Providers purportedly issued prescriptions for Fraudulent Equipment used by All City Supply, Irbo Supply, Soan Supply, and XL Supply as the basis to submit billing to GEICO.

135.   In further keeping with the fact that the Defendants paid illegal kickbacks in exchange for prescriptions for Fraudulent Equipment, GEICO has identified, in a series of related investigations, that a group of unlicensed laypersons combined to misappropriate and illegally use the name, New York license, signature and other relevant information of healthcare professionals based out of Maryland, New York and Missouri, to bill GEICO for services purportedly performed at, among other locations, a Clinic located at 2598 3rd Avenue, Bronx, New York, which was another Clinic where Referring Providers purportedly issued prescriptions for Fraudulent Equipment used by All City Supply, Irbo Supply, Soan Supply, and XL Supply as the basis to submit billing to GEICO.  See Gov't Emps. Ins. Co., et al. v. Gary Grody a/k/a Lance Grody, et al., Dkt. No. 22-cv-03598 (BMC)(E.D.N.Y. 2022); Gov't Emps. Ins. Co., et al. v. Gary Grody a/k/a Lance Grody, et al., Dkt. No. 22-cv-06187(KAM)(PK) (E.D.N.Y. 2022); Gov't Emps. Ins. Co., et al. v. Susan J. Polino PhD., et al., Dkt. No. 1:22-cv-05178(ARR)(PK) (E.D.N.Y. 2022); Gov't Emps. Ins. Co., et al. v. Poonawala, et al., Dkt. No. 1:22-cv-03063(PKC)(VMS) (E.D.N.Y. 2022); Gov't Emps. Ins. Co., et al. v. Bily-Linder, et al., Dkt. No. 1:23-cv-00515(FB)(RML) (E.D.N.Y. 2023).

136.   The prescriptions for Fraudulent Equipment provided to the Defendants from the Clinics were not medically necessary, were provided pursuant to predetermined fraudulent protocols that provided Insureds with predetermined sets of virtually identical Fraudulent Equipment, and frequently never actually were issued by the Referring Provider.

137.    In keeping with the fact that the Defendants obtained prescriptions for Fraudulent Equipment which were not medically necessary and were provided pursuant to predetermined fraudulent protocols, the Defendants: (i) received virtually identical predetermined sets of prescriptions from multiple Referring Providers operating out of the same Clinic; and (ii) obtained prescriptions for Fraudulent Equipment directly from the Clinics without any communication with or involvement by the Insureds.

138.    Furthermore, and to the extent that the Insureds received any Fraudulent Equipment, the Insureds were provided with Fraudulent Equipment directly from the Clinics, typically from the receptionists, without any involvement from the Defendants.

139.    In all of the claims identified in Exhibits "1" through "6", the Defendants knowingly misrepresented that Fraudulent Equipment was provided pursuant to lawful prescriptions from healthcare providers and were, therefore, eligible to collect No-Fault Benefits in the first instance, when the prescriptions were provided -- to the extent provided at all -- pursuant to unlawful financial arrangements.

**E.      The Prescriptions Obtained Pursuant to Predetermined Fraudulent Protocols**

140.    In addition to the Defendants' unlawful financial arrangements pursuant to agreements with others who are not presently identifiable, the Defendants obtained prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers, which were issued pursuant to predetermined fraudulent protocols designed to maximize the billing that the Defendants – and others – could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds.

141.    In the claims identified in Exhibits "1" through "6", virtually all of the Insureds were involved in relatively minor and low-impact "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

142.    Concomitantly, almost none of the Insureds identified in Exhibits "1" through "6", whom the Referring Providers purported to treat, suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

143.    In keeping with the fact that the Insureds identified in Exhibits "1" through "6" suffered only minor injuries – to the extent they had any injuries at all – as a result of the relatively minor accidents, many of the Insureds did not seek treatment at any hospital as a result of their accidents.

144.    To the extent the Insureds in the claims identified in Exhibits "1" through "6" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis, and then sent on their way with nothing more serious than a minor soft tissue injury, such as a sprain or strain.

145.    However, despite virtually all of the Insureds being involved in relatively minor and low-impact accidents and only suffering from sprains and strains – to the extent that the Insureds were actually injured – virtually all of the Insureds who treated with each of the Referring Providers were subject to extremely similar treatment, including nearly identical prescriptions for Fraudulent Equipment.

146.    The prescriptions for Fraudulent Equipment that were purportedly issued to the Insureds identified in Exhibits "1" through "6" were issued pursuant to predetermined fraudulent protocols set forth at each Clinic, and not because the Fraudulent Equipment was medically necessary for each Insured based upon his or her individual symptoms or presentations.

147.    For example, virtually all of the Insureds were prescribed orthotic devices after their low-speed and low-impact motor vehicle accidents, when such orthotic devices are – in a legitimate setting – only provided after appropriate consideration for a specific, documented, and corelated condition to patients.

148.    No legitimate physician, chiropractor, other licensed healthcare provider, or professional entity would permit prescriptions for Fraudulent Equipment to be issued based upon the fraudulent protocols described below.

149.    In general, the Defendants obtained prescriptions for medically unnecessary Fraudulent Equipment purportedly issued by the Referring Providers pursuant to the following predetermined fraudulent protocols:

(i)     an Insured would arrive at a Clinic for treatment subsequent to a motor vehicle accident;

(ii)    the Insured would be seen by a Referring Provider;

(iii)   on the date of the first visit, the Referring Provider would direct the Insured to undergo conservative treatment and purportedly provide a prescription for a set of DME and/or OD;

(iv)    subsequently, to the extent the Insured returned to the Clinic for one or more additional evaluations and treatment, they would be provided with at least one additional prescription for a predetermined set of DME and/or OD, although the Referring Provider did not always treat the Insured on the date of the additional prescription for DME and/or OD; and

(v)     at least one, if not more than one, prescription for DME and/or OD would be directly provided to the Defendants to fill and was without any involvement by the Insured.

150.    Virtually all of the claims identified in Exhibits "1" through "6" are based upon medically unnecessary prescriptions for predetermined sets of Fraudulent Equipment, which were purportedly issued by the Referring Providers who practiced at various Clinics across the New York metropolitan area.

151.    In a legitimate setting, when a patient injured in a motor vehicle accident seeks treatment by a healthcare provider, the patient's subjective complaints are evaluated, and the treating provider will direct a specific course of treatment based upon the patients' individual symptoms or presentation.

152.    Furthermore, in a legitimate setting, during a patient's treatment, a healthcare provider <u>may</u> – but generally does not – prescribe DME and/or OD.

153.    In determining whether to prescribe DME and/or OD to a patient – in a legitimate setting – a healthcare provider should evaluate multiple factors, including: (i) whether the specific DME and/or OD could have any negative effects based upon the patient's physical condition and medical history; (ii) whether the DME and/or OD is likely to help improve the patient's complained of condition; and (iii) whether the patient is likely to use the DME and/or OD. In all circumstances, any prescribed DME and/or OD would always directly relate to each patient's individual symptoms or presentation.

154.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in an automobile accident.

155.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

156.    If a healthcare provider determines that DME and/or OD is medically necessary after considering a patient's individual circumstances and situations, in a legitimate setting, the healthcare provider would indicate in a contemporaneous medical record, such as an evaluation report, what specific DME and/or OD was prescribed, why it was medically necessary, or how it would help the Insureds.

157.    Further, in a legitimate setting, when a patient returns for an examination after being prescribed DME and/or OD, the healthcare provider would inquire – and appropriately report – whether the previously prescribed DME and/or OD aided the patient's subjective complaints. Such information is typically included so the healthcare provider can recommend a further course of treatment regarding the previously prescribed DME and/or OD or newly issued DME and/or OD.

158.    It is improbable – to the point of an impossibility – that virtually all of the Insureds identified in Exhibits "1" through "6" who treated at a specific Clinic would receive virtually identical prescriptions for numerous items of Fraudulent Equipment, despite being different ages, in different physical conditions, and involved in different motor vehicle accidents.

159.    It is even more improbable – to the point of impossibility – that virtually all of the Insureds identified in Exhibits "1" through "6" who treated with different Referring Providers at a specific Clinic would receive virtually identical prescriptions for numerous items of Fraudulent Equipment despite being different ages, in different physical conditions, and involved in different motor vehicle accidents.

160.    Here, and in keeping with the fact that the prescriptions provided to the Defendants were for medically unnecessary Fraudulent Equipment obtained as part of predetermined fraudulent protocols, virtually all of the Insureds identified in Exhibits "1" through "6" that treated at a specific Clinic were issued virtually identical prescriptions for a predetermined set of Fraudulent Equipment.

161.    While the specific preset prescriptions of Fraudulent Equipment varied based upon the specific Clinic that the Insured visited, there were multiple items of Fraudulent Equipment that were purportedly prescribed to virtually all the Insureds identified in Exhibits "1" through "6" regardless which Clinic the insureds visited.

162.    In also in keeping with the fact that the prescriptions for Fraudulent Equipment used by the Defendants were medically unnecessary and obtained as part of a predetermined fraudulent protocol, many of the prescriptions were purportedly issued by the Referring Providers on dates that the Insureds never even treated with the Referring Providers.

163.    Also, and in further keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibits "1" through "6" were issued pursuant to predetermined fraudulent protocols and not for the benefit of the Insureds, as set forth below, the Referring Providers issued similar checkmark-based prescriptions and routinely issued multiple checkmark-based prescriptions to a single patient on the same day when there was no legitimate reason to do so.

164.    The multiple checkmark-based prescriptions issued by the Referring Providers to an Insured on the same date was part of a predetermined fraudulent protocol that was designed to allow the Defendants to submit multiple bills to GEICO for Fraudulent Equipment in an effort to artificially lower the total dollar amount submitted on each bill and avoid detection.

165.    In further keeping with the fact that the prescriptions for Fraudulent Equipment were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, to the extent that there was a contemporaneously dated evaluation report, the evaluation report virtually always failed to explain – and oftentimes failed to identify – the Fraudulent Equipment identified on the prescriptions provided to the Defendants and used by the Defendants to bill GEICO for the charges identified in Exhibits "1" through "6".

166.    Also in keeping with the fact that the prescriptions for Fraudulent Equipment purportedly issued to the Insureds identified in Exhibits "1" through "6" were not medically necessity but were the result of a predetermined fraudulent protocol, the prescriptions often

contained vague and generic descriptions for DME and OD, which – as explained in more detail below – provided the Defendants with the opportunity to purportedly provide – and bill GEICO for – whatever DME or OD they wanted.

167.    Even more, and as also explained below in more detail, the charges to GEICO identified in Exhibits "1" through "6" were not based upon prescriptions for medically necessary Fraudulent Equipment, because the Defendants purportedly provided Insureds with whatever DME or OD they wanted, as the Fraudulent Equipment purportedly provided by each of the DME Defendants – and billed to GEICO – was often not the item identified in the prescriptions purportedly issued by the Referring Providers.

168.    In further keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibits "1" through "6" were issued because of predetermined fraudulent protocols and not based upon medical necessity, the prescriptions purportedly issued by the Referring Providers were never given to the Insureds.

169.    Instead, the Insureds were often provided with Fraudulent Equipment directly from the Clinics' receptionists, without any interaction with the Defendants – to the extent that the Insureds actually received any Fraudulent Equipment – and the prescriptions were routed directly to the Defendants from the Clinics.

170.    For the reasons set forth above, and below, in each of the claims identified in Exhibits "1" through "6", the Defendants falsely represented that Fraudulent Equipment was provided pursuant to prescriptions from healthcare providers for medically necessary DME or OD, and were, therefore, eligible to collect No-Fault Benefits in the first instance, when, in fact, the prescriptions were for medically unnecessary Fraudulent Equipment issued pursuant to

predetermined fraudulent protocols and provided to the Defendants pursuant agreements with others who are not presently identifiable.

### 1)   The Predetermined Fraudulent Protocol at the Richmond Ave. Clinic

171.   The Richmond Ave. Clinic was one of the Clinics where the Defendants conspired with others who are not presently identifiable to obtain medically unnecessary prescriptions for Fraudulent Equipment pursuant to a predetermined fraudulent protocol.

172.   After their involvement in minor "fender-bender" motor vehicle accidents, many of the Insureds who purportedly received Fraudulent Equipment from All City Supply, Irbo Supply, Easy Way Supply, Soan Supply, and XL Supply and identified in Exhibits "1" through "5" purportedly received treatment from Referring Provider S. Ramchandran Nair, M.D. ("Nair").

173.   Nair pled guilty in 2003 to, among other things, submitting a false Medicaid claim and was excluded from participating in all federally funded health care programs for five years. Thereafter, in 2006, he was placed on probation by the New York State Board after being charged with two counts of professional misconduct.

174.   Virtually every Insured identified in Exhibits "1" through "5" who purportedly received treatment at the Richmond Ave. Clinic was provided with an initial examination from Nair. After their purported initial examination, each of the Insureds were prescribed multiple items of Fraudulent Equipment.

175.   When the Insureds sought treatment with and were purportedly provided with an initial evaluation by Nair at the Richmond Ave. Clinic, he did not evaluate each Insured's individual symptoms or presentation to determine whether and what type of DME and/or OD to provide.

176.     Rather, Nair purportedly issued prescriptions for a predetermined set of Fraudulent Equipment to each Insured after a purported initial examination based upon a predetermined fraudulent protocol.

177.     In keeping with the fact that the prescriptions issued to the Insureds by Nair at the Richmond Ave. Clinic after purported initial examinations were not medically necessary and were issued pursuant to predetermined fraudulent protocols, Nair never evaluated each Insured's individual symptoms or presentation to determine whether and what type of DME and/or OD would aid in each Insured's treatment.

178.     Instead, and in keeping with the fact that the prescriptions issued to the Insureds after their initial examinations were not medically necessary and were issued pursuant to predetermined fraudulent protocols, virtually every Insured who underwent an initial examination at the Richmond Ave. Clinic received a prescription for virtually the same type of Fraudulent Equipment.

179.     Regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, or whether each patient would actually use the Fraudulent Equipment, after a purported initial examination at the Richmond Ave. Clinic, Nair virtually always prescribed the following Fraudulent Equipment: (i) "Cervical collar 2pc"; (ii) "LSO support"; (iii) "Bed board"; (iv) "Egg crate mattress"; and (v) "Cervical pillow".

180.     Insureds were also prescribed either a "Lumbar cushion" or an "Orthopedic car seat" depending on if they were the driver or passenger in the underlying automobile accident.

181.     As part of the predetermined fraudulent protocol where prescriptions for Fraudulent Equipment were issued to the Insureds identified in Exhibits "1" through "5," if the Insureds returned to the Richmond Ave. Clinic for further treatment, the Insureds would virtually always

be provided with at least one or more additional prescriptions for a predetermined set of Fraudulent Equipment purportedly issued by Nair.

182.    Regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, each patient's recovery since the accident, or whether each patient would actually use the Fraudulent Equipment, the Insureds identified in Exhibits "1" through "5" that continued treatment at the Richmond Ave. Clinic were virtually always prescribed the following Fraudulent Equipment: (i) "Massager"; (ii) "Infa (sp) red lamp"; (iii) "EMS unit"; and (iv) "EMS belt".

183.    In addition to the items prescribed to virtually every Insured who continued treatment at the Richmond Ave. Clinic, as part of the predetermined fraudulent protocols, the Insureds were also provided with separate additional prescriptions for Fraudulent Equipment that virtually always included at least one of following: (i) "L0632 Lumbar sacral orthosis"; and (ii) "E0855 Cervical traction device/pump".

184.    In keeping with the fact that the prescriptions for Fraudulent Equipment from the Richmond Ave. Clinic were fraudulently issued as part of predetermined protocol and without medical necessity, the vast majority of Insureds identified in Exhibits "1" through "5" received multiple separate prescriptions for Fraudulent Equipment on a single date that were purportedly issued by Nair.

185.    Upon information and belief, multiple separate prescriptions were issued to the Insureds on a single date as part of the scheme between the Defendants and unidentifiable third-party individuals to provide the Defendants with the ability to submit separate bills to GEICO for reimbursement of No-Fault Benefits as a way to lower the amount charged to GEICO on each bill so the Defendants could avoid detection of their fraudulent schemes.

186.     In keeping with the fact that the prescriptions for Fraudulent Equipment purportedly issued to Insureds were medically unnecessary and were provided pursuant to a predetermined fraudulent protocol, there was no legitimate reason for Nair to issue multiple prescriptions for Fraudulent Equipment to a single Insured on the same date. The multiple prescriptions for Fraudulent Equipment could have easily been provided on one single prescription as each prescription used the same checkmark-based form containing a list of DME/OD.

187.     In further keeping with the fact that the prescriptions for Fraudulent Equipment purportedly issued to Insureds were medically unnecessary and were provided pursuant to a predetermined fraudulent protocol, when two or more Insureds were involved in the same underlying accident and sought treatment at the Richmond Ave. Clinic, they each received virtually identical prescriptions for Fraudulent Equipment, despite being situated differently inside the subject motor vehicle, different ages, and in different physical conditions.

188.     For example:

(i)      On January 15, 2021, an Insured named AM was purportedly involved in a motor vehicle accident. AM purportedly started treating at the Richmond Ave. Clinic with Nair on February 9, 2021. After Nair purportedly performed an initial examination of AM, Nair purportedly issued a prescription in the name of AM that was provided to **All City Supply** that included the following Fraudulent Equipment: (i) "Cervical collar 2pc"; (ii) "LSO support"; (iii) "Bed board"; (iv) "Egg crate mattress"; (v) "Cervical pillow"; and (vi) "Lumbar cushion".  On March 24, 2021, after a purported follow-up examination with Nair, Nair purportedly issued three separate prescriptions in the name of AM that were each provided to **All City Supply** for: (i) "Massager", "Infa red lamp", "EMS unit", and "EMS belt"; (ii) "L0632 Lumbar sacral orthosis"; and (iii) "E0855 Cervical traction device/pump".

(ii)     On March 2, 2021, an Insured named AF was purportedly involved in a motor vehicle accident. AF purportedly started treating at the Richmond Ave. Clinic with Nair on March 10, 2021. After Nair purportedly performed an initial examination of AF, Nair purportedly issued a prescription in the name of AF that was provided to **All City Supply** that included the following Fraudulent Equipment: (i) "Cervical collar 2pc"; (ii) "LSO

support"; (iii) "Bed board"; (iv) "Egg crate mattress"; (v) "Cervical pillow"; and (vi) "Lumbar cushion". On April 7, 2021, after a purported follow-up examination with Nair, Nair purportedly issued three separate prescriptions in the name of AF that were each provided to **All City Supply** for: (i) "Massager", "Infa red lamp", "EMS unit", and "EMS belt"; (ii) "L0632 Lumbar sacral orthosis"; and (iii) "E0855 Cervical traction device/pump".

(iii)     On April 1, 2021, an Insured named SC was purportedly involved in a motor vehicle accident. SC purportedly started treating at the Richmond Ave. Clinic with Nair on April 14, 2021. After Nair purportedly performed an initial examination of SC, Nair purportedly issued a prescription in the name of SC that was provided to **All City Supply** that included the following Fraudulent Equipment: (i) "Cervical collar 2pc"; (ii) "LSO support"; (iii) "Bed board"; (iv) "Egg crate mattress"; (v) "Cervical pillow"; and (vi) "Orthopedic car seat". On May 12, 2021, after a purported follow-up examination with Nair, Nair purportedly issued three separate prescriptions in the name of SC that were each provided to **All City Supply** for: (i) "Massager", "Infa red lamp", "EMS unit", and "EMS belt"; (ii) "L0632 Lumbar sacral orthosis"; and (iii) "E0855 Cervical traction device/pump".

(iv)     On April 26, 2021, two Insureds named EP1 and EP2 were purportedly involved in a motor vehicle accident. EP1 purportedly started treating at the Richmond Ave. Clinic with Nair on April 28, 2021 and EP2 purportedly started treating at the Richmon Ave. Clinic with Nair on May 5, 2021. After Nair purportedly performed an initial examination of EP1, Nair purportedly issued a prescription in the name of EP1 that was provided to **All City Supply** that included the following Fraudulent Equipment: (i) "Cervical collar 2pc"; (ii) "LSO support"; (iii) "Bed board"; (iv) "Egg crate mattress"; (v) "Cervical pillow"; and (vi) "Orthopedic car seat". After Nair purportedly performed an initial examination of EP2, Nair purportedly issued a prescription in the name of EP2 that was provided to **All City Supply** that included the following Fraudulent Equipment: (i) "Cervical collar 2pc"; (ii) "LSO support"; (iii) "Bed board"; (iv) "Egg crate mattress"; (v) "Cervical pillow"; and (vi) "Lumbar cushion".

(v)     On June 2, 2021, an Insured named DD was purportedly involved in a motor vehicle accident. DD purportedly started treating at the Richmond Ave. Clinic with Nair on June 16, 2021. After Nair purportedly performed an initial examination of DD, Nair purportedly issued a prescription in the name of DD that was provided to **All City Supply** that included the following Fraudulent Equipment: (i) "Cervical collar 2pc"; (ii) "LSO support"; (iii) "Bed board"; (iv) "Egg crate mattress"; (v) "Cervical pillow"; and (vi) "Orthopedic car seat". On July 14, 2021, after a purported follow-up examination with Nair, Nair purportedly issued three separate prescriptions in the name of DD that were each provided to **All City Supply** for: (i) "Massager", "Infa red lamp", "EMS unit", and "EMS belt"; (ii)

"L0632 Lumbar sacral orthosis"; and (iii) "E0855 Cervical traction device/pump".

(vi)     On November 2, 2021, two Insureds named KA and JC were purportedly involved in a motor vehicle accident. KA and JC both purportedly started treating at the Richmond Ave. Clinic with Nair on November 3, 2021. After Nair purportedly performed an initial examination of KA, Nair purportedly issued a prescription in the name of KA that was provided to **Irbo Supply** that included the following Fraudulent Equipment: (i) "Cervical collar 2pc"; (ii) "LSO support"; (iii) "Bed board"; (iv) "Egg crate mattress"; (v) "Cervical pillow"; and (vi) "Orthopedic car seat".   After Nair purportedly performed an initial examination of JC, Nair purportedly issued a prescription in the name of JC that was provided to **Irbo Supply** that included the following Fraudulent Equipment: (i) "Cervical collar 2pc"; (ii) "LSO support"; (iii) "Bed board"; (iv) "Egg crate mattress"; (v) "Cervical pillow"; and (vi) "Lumbar cushion".   On December 15, 2021, after a purported follow-up examination with Nair, Nair purportedly issued KA and JC each three separate prescriptions that were all provided to **Irbo Supply** for: (i) "Massager", "Infa red lamp", "EMS unit", and "EMS belt"; (ii) "L0632 Lumbar sacral orthosis"; and (iii) "E0855 Cervical traction device/pump".

(vii)    On December 9, 2021, an Insured named DK was purportedly involved in a motor vehicle accident. DK purportedly started treating at the Richmond Ave. Clinic with Nair on December 22, 2021. After Nair purportedly performed an initial examination of DK, Nair purportedly issued a prescription in the name of DK that was provided to **Irbo Supply** that included the following Fraudulent Equipment: (i) "Cervical collar 2pc"; (ii) "LSO support"; (iii) "Bed board"; (iv) "Egg crate mattress"; (v) "Cervical pillow"; and (vi) "Orthopedic car seat".   On January 5, 2022, after a purported follow-up examination with Nair, Nair purportedly issued three separate prescriptions in the name of DK that were each provided to **Irbo Supply** for: (i) "Massager", "Infa red lamp", "EMS unit", and "EMS belt"; (ii) "L0632 Lumbar sacral orthosis"; and (iii) "E0855 Cervical traction device/pump".

(viii)   On December 16, 2021, an Insured named SC was purportedly involved in a motor vehicle accident. SC purportedly started treating at the Richmond Ave. Clinic with Nair on December 22, 2021. After Nair purportedly performed an initial examination of SC, Nair purportedly issued a prescription in the name of SC that was provided to **Irbo Supply** that included the following Fraudulent Equipment: (i) "Cervical collar 2pc"; (ii) "LSO support"; (iii) "Bed board"; (iv) "Egg crate mattress"; (v) "Cervical pillow"; and (vi) "Lumbar cushion".   On January 19, 2022, after a purported follow-up examination with Nair, Nair purportedly issued three separate prescriptions in the name of SC that were each provided to **Irbo Supply** for:

(i) "Massager", "Infa red lamp", "EMS unit", and "EMS belt"; (ii) "L0632 Lumbar sacral orthosis" and "R Knee brace"; and (iii) "E0855 Cervical traction device/pump".

(ix)   On February 4, 2022, an Insured named LK was purportedly involved in a motor vehicle accident. LK purportedly started treating at the Richmond Ave. Clinic with Nair on March 9, 2022. After Nair purportedly performed an initial examination of LK, Nair purportedly issued a prescription in the name of LK that was provided to **Easy Way Supply** that included the following Fraudulent Equipment: (i) "Cervical collar 2pc"; (ii) "LSO support"; (iii) "Bed board"; (iv) "Egg crate mattress"; (v) "Cervical pillow"; and (vi) "Orthopedic car seat". On April 6, 2022, after a purported follow-up examination with Nair, Nair purportedly issued three separate prescriptions in the name of LK that were each provided to **Easy Way Supply** for: (i) "Massager", "Infa red lamp", "EMS unit", and "EMS belt"; (ii) "L0632 Lumbar sacral orthosis"; and (iii) "E0855 Cervical traction device/pump".

(x)   On February 5, 2022, two Insureds named JC and NC were purportedly involved in a motor vehicle accident. JC and JC both purportedly started treating at the Richmond Ave. Clinic with Nair on February 9, 2022. After Nair purportedly performed an initial examination of JC, Nair purportedly issued a prescription in the name of KA that was provided to **Irbo Supply** that included the following Fraudulent Equipment: (i) "Cervical collar 2pc"; (ii) "LSO support"; (iii) "Bed board"; (iv) "Egg crate mattress"; (v) "Cervical pillow"; and (vi) "Orthopedic car seat". After Nair purportedly performed an initial examination of NC, Nair purportedly issued a prescription in the name of JC that was provided to **Irbo Supply** that included the following Fraudulent Equipment: (i) "Cervical collar 2pc"; (ii) "LSO support"; (iii) "Bed board"; (iv) "Egg crate mattress"; (v) "Cervical pillow"; and (vi) "Lumbar cushion". On March 9, 2022, after a purported follow-up examination with Nair, Nair purportedly issued JC and JC each three separate prescriptions that were all provided to **Irbo Supply** for: (i) "Massager", "Infa red lamp", "EMS unit", and "EMS belt"; (ii) "L0632 Lumbar sacral orthosis"; and (iii) "E0855 Cervical traction device/pump".

(xi)   On February 9, 2022, an Insured named AA was purportedly involved in a motor vehicle accident. AA purportedly started treating at the Richmond Ave. Clinic with Nair on March 9, 2022. After Nair purportedly performed an initial examination of AA, Nair purportedly issued a prescription in the name of AA that was provided to **Easy Way Supply** that included the following Fraudulent Equipment: (i) "Cervical collar 2pc"; (ii) "LSO support"; (iii) "Bed board"; (iv) "Egg crate mattress"; (v) "Cervical pillow"; and (vi) "Lumbar cushion". On April 6, 2022, after a purported follow-up examination with Nair, Nair purportedly issued three separate prescriptions in the name of AA that were each provided to **Easy Way Supply** for: (i)

"Massager", "Infa red lamp", "EMS unit", and "EMS belt"; (ii) "L0632 Lumbar sacral orthosis"; and (iii) "E0855 Cervical traction device/pump".

(xii)     On March 18, 2022, two Insureds named LO and EO were purportedly involved in a motor vehicle accident. LO and EO purportedly started treating at the Richmond Ave. Clinic with Nair on March 23, 2022 and EO purportedly started treating at the Richmond Ave. Clinic with Nair on April 6, 2022. After Nair purportedly performed an initial examination of LO, Nair purportedly issued a prescription in the name of KA that was provided to **Easy Way Supply** that included the following Fraudulent Equipment: (i) "Cervical collar 2pc"; (ii) "LSO support"; (iii) "Bed board"; (iv) "Egg crate mattress"; (v) "Cervical pillow"; and (vi) "Orthopedic car seat".  After Nair purportedly performed an initial examination of EO, Nair purportedly issued a prescription in the name of JC that was provided to **Easy Way Supply** that included the following Fraudulent Equipment: (i) "Cervical collar 2pc"; (ii) "LSO support"; (iii) "Bed board"; (iv) "Egg crate mattress"; (v) "Cervical pillow"; and (vi) "Lumbar cushion".  After LO's purported follow-up examination with Nair on April 26, 2022 and EO's purported follow-up examination with Nair on May 4, 2022, Nair purportedly issued LO and EO each three separate prescriptions that were all provided to **Easy Way Supply** for: (i) "Massager", "Infa red lamp", "EMS unit", and "EMS belt"; (ii) "L0632 Lumbar sacral orthosis"; and (iii) "E0855 Cervical traction device/pump".

(xiii)    On May 6, 2022, an Insured named CC was purportedly involved in a motor vehicle accident. CC purportedly started treating at the Richmond Ave. Clinic with Nair on May 11, 2022. After Nair purportedly performed an initial examination of CC, Nair purportedly issued a prescription in the name of CC that was provided to **Easy Way Supply** that included the following Fraudulent Equipment: (i) "Cervical collar 2pc"; (ii) "LSO support"; (iii) "Bed board"; (iv) "Egg crate mattress"; (v) "Cervical pillow"; and (vi) "Orthopedic car seat".  On June 8, 2022, after a purported follow-up examination with Nair, Nair purportedly issued three separate prescriptions in the name of CC that were each provided to **Easy Way Supply** for: (i) "Massager", "Infa red lamp", "EMS unit," and "EMS belt"; (ii) "L0632 Lumbar sacral orthosis"; and (iii) "E0855 Cervical traction device/pump".

(xiv)    On May 25, 2022, an Insured named CD was purportedly involved in a motor vehicle accident. CD purportedly started treating at the Richmond Ave. Clinic with Nair on June 1, 2022. After Nair purportedly performed an initial examination of CD, Nair purportedly issued a prescription in the name of CD that was provided to **Soan Supply** that included the following Fraudulent Equipment: (i) "Cervical collar 2pc"; (ii) "LSO support"; (iii) "Bed board"; (iv) "Egg crate mattress"; (v) "Cervical pillow"; and (vi)

"Orthopedic car seat".   On June 28, 2022, after a purported follow-up examination with Nair, Nair purportedly issued three separate prescriptions in the name of CD that were each provided to **Soan Supply** for: (i) "Massager", "Infa red lamp", "TENS unit", and "TENS belt"; (ii) "L0632 Lumbar sacral orthosis"; and (iii) "E0855 Cervical traction device/pump".

(xv)   On June 4, 2022, an Insured named SI was purportedly involved in a motor vehicle accident. SI purportedly started treating at the Richmond Ave. Clinic with Nair on June 8, 2022. After Nair purportedly performed an initial examination of SI, Nair purportedly issued a prescription in the name of SI that was provided to **Soan Supply** that included the following Fraudulent Equipment: (i) "Cervical collar 2pc"; (ii) "LSO support"; (iii) "Bed board"; (iv) "Egg crate mattress"; (v) "Cervical pillow"; and (vi) "Orthopedic car seat".   On July 6, 2022, after a purported follow-up examination with Nair, Nair purportedly issued three separate prescriptions in the name of SI that were each provided to **Soan Supply** for: (i) "Massager", "Infa red lamp", "TENS unit", and "TENS belt"; (ii) "L0632 Lumbar sacral orthosis"; and (iii) "E0855 Cervical traction device/pump".

(xvi)   On June 15, 2022, an Insured named JC was purportedly involved in a motor vehicle accident. JC purportedly started treating at the Richmond Ave. Clinic with Nair on June 28, 2022. After Nair purportedly performed an initial examination of JC, Nair purportedly issued a prescription in the name of JC that was provided to **Soan Supply** that included the following Fraudulent Equipment: (i) "Cervical collar 2pc"; (ii) "LSO support"; (iii) "Bed board"; (iv) "Egg crate mattress"; (v) "Cervical pillow"; and (vi) "Lumbar cushion".   On August 3, 2022, after a purported follow-up examination with Nair, Nair purportedly issued three separate prescriptions in the name of JC that were each provided to **Soan Supply** for: (i) "Massager", "Infa red lamp", "TENS unit", and "TENS belt"; (ii) "L0632 Lumbar sacral orthosis"; and (iii) "E0855 Cervical traction device/pump".

(xvii)   On August 6, 2022, an Insured named LK was purportedly involved in a motor vehicle accident. LK purportedly started treating at the Richmond Ave. Clinic with Nair on August 17, 2022. After Nair purportedly performed an initial examination of LK, Nair purportedly issued a prescription in the name of LK that was provided to **Soan Supply** that included the following Fraudulent Equipment: (i) "Cervical collar 2pc"; (ii) "LSO support"; (iii) "Bed board"; (iv) "Egg crate mattress"; (v) "Cervical pillow"; and (vi) "Lumbar cushion".   On September 21, 2022, after a purported follow-up examination with Nair, Nair purportedly issued three separate prescriptions in the name of LK that were each provided to **Soan Supply** for: (i) "Massager", "Infa red lamp", "EMS unit", and "EMS belt"; (ii) "L0632 Lumbar sacral orthosis"; and (iii) "E0855 Cervical traction device/pump".

(xviii)  On August 20, 2022, an Insured named QY was purportedly involved in a motor vehicle accident. QY purportedly started treating at the Richmond Ave. Clinic with Nair on September 21, 2022. After Nair purportedly performed an initial examination of QY, Nair purportedly issued a prescription in the name of QY that was provided to **Soan Supply** that included the following Fraudulent Equipment: (i) "Cervical collar 2pc"; (ii) "LSO support"; (iii) "Bed board"; (iv) "Egg crate mattress"; (v) "Cervical pillow"; and (vi) "Lumbar cushion". On October 18, 2022, after a purported follow-up examination with Nair, Nair purportedly issued three separate prescriptions in the name of QY that were each provided to **XL Supply** for: (i) "Massager", "Infa red lamp", "EMS unit", and "EMS belt"; (ii) "L0632 Lumbar sacral orthosis"; and (iii) "E0855 Cervical traction device/pump".

(xix)  On September 2, 2022, an Insured named NZ was purportedly involved in a motor vehicle accident. NZ purportedly started treating at the Richmond Ave. Clinic with Nair on September 7, 2022. After Nair purportedly performed an initial examination of NZ, Nair purportedly issued a prescription in the name of NZ that was provided to **Soan Supply** that included the following Fraudulent Equipment: (i) "Cervical collar 2pc"; (ii) "LSO support"; (iii) "Bed board"; (iv) "Egg crate mattress"; (v) "Cervical pillow"; and (vi) "Orthopedic car seat". On October 4, 2022, after a purported follow-up examination with Nair, Nair purportedly issued three separate prescriptions in the name of NZ that were each provided to **XL Supply** for: (i) "Massager", "Infa red lamp", "EMS unit", and "EMS belt"; (ii) "L0632 Lumbar sacral orthosis"; and (iii) "E0855 Cervical traction device/pump".

(xx)  On October 8, 2022, an Insured named WO was purportedly involved in a motor vehicle accident. WO purportedly started treating at the Richmond Ave. Clinic with Nair on September 21, 2022. After Nair purportedly performed an initial examination of WO, Nair purportedly issued a prescription in the name of WO that was provided to **Soan Supply** that included the following Fraudulent Equipment: (i) "Cervical collar 2pc"; (ii) "LSO support"; (iii) "Bed board"; (iv) "Egg crate mattress"; (v) "Cervical pillow"; and (vi) "Lumbar cushion". On November 30, 2022, after a purported follow-up examination with Nair, Nair purportedly issued three separate prescriptions in the name of WO that were each provided to **XL Supply** for: (i) "Massager", "Infa red lamp", "EMS unit", and "EMS belt"; (ii) "L0632 Lumbar sacral orthosis"; and (iii) "E0855 Cervical traction device/pump".

189.  These are only representative examples.

190.    In fact, virtually all of the Insureds identified in Exhibits "1" – "5" that received treatment at the Richmond Ave. Clinic were issued prescriptions for Fraudulent Equipment pursuant to the predetermined fraudulent protocol identified above.

191.    In keeping with the fact that the prescriptions for Fraudulent Equipment provided to the Defendants from Richmond Ave. Clinic were medically unnecessary and issued pursuant to a predetermined fraudulent protocol, an overwhelming majority of the Insureds who treated at the Richmond Ave. Clinic received multiple prescriptions for virtually the same type of Fraudulent Equipment, similar to the examples above, despite the fact that they were involved in relatively minor and low-impact motor vehicle accidents.

192.    In further keeping with the fact that the prescriptions for Fraudulent Equipment from the Richmond Ave. Clinic that were used to support the charges identified in Exhibits "1" – "5" were not medically necessary and were issued pursuant to a predetermined fraudulent protocol, the contemporaneously dated medical records, such as an initial examination report or a follow-up examination report, virtually never identified all the Fraudulent Equipment purportedly prescribed to the Insureds.

193.    Also, and in keeping with the fact that the prescriptions for Fraudulent Equipment from the Richmond Ave. Clinic were not medically necessary and issued pursuant to a predetermined fraudulent protocol, the contemporaneous examination reports failed to identify, sometimes in any way, all the Fraudulent Equipment prescribed to Insureds, if the report identified the Fraudulent Equipment at all.

194.    To the extent that the contemporaneous reports issued by Nair at the Richmond Ave. Clinic did reference any of the Fraudulent Equipment prescribed, the evaluation reports

virtually never contained any specific detail explaining why or how the prescribed Fraudulent Equipment would benefit or aid the Insured.

195.    Furthermore, and in keeping with the fact that the prescriptions for Fraudulent Equipment from the Richmond Ave. Clinic were not medically necessary and were issued pursuant to a predetermined fraudulent protocol, the follow-up examination reports never referenced or discussed the Insureds' previously prescribed Fraudulent Equipment, and virtually never provided any indication whether to continue using any of previously prescribed Fraudulent Equipment.

196.    In a legitimate setting, when a patient returns for a follow-up examination after being prescribed DME and/or OD, the healthcare provider would inquire – and appropriately report – whether the previously prescribed DME and/or OD aided the patient's subjective complaints. Such information is typically included so the healthcare provider can recommend a further course of treatment regarding the previously prescribed DME and/or OD or newly issued DME and/or OD.

197.    However, the follow-up examination reports from Nair at the Richmond Ave. Clinic failed to include any information regarding the Fraudulent Equipment prescribed to the Insureds on a prior date.

198.    Additionally, as part of the fraudulent scheme between the Defendants and unidentified third-party individuals associated with the Richmond Ave. Clinic, the prescriptions from the Richmond Ave. Clinic were never given to the Insureds but were routed directly to the Defendants, thus taking any risk out of the equation that an Insured would fill the prescription from an outside source or not fill all or part of the prescription. In fact, in many cases, the Insureds were provided with Fraudulent Equipment directly from receptionists at the Richmond Ave. Clinic,

without any interaction with or instruction concerning their use from either the Defendants or a healthcare provider.

199.   As further part of the fraudulent scheme between the Defendants and unidentified third-party individuals, the prescriptions from the Richmond Ave. Clinic were purposefully generic and vague to allow the Defendants to choose the specific type of Fraudulent Equipment that they purported to provide Insureds and bill GEICO and other New York automobile insurers, in order to increase their financial gain.

200.   By way of example, the prescriptions do not specify a type of cervical collar or lumbosacral support that patients should receive by providing a specific HCPCS Code – or a detailed description that could only be associated with one type of HCPCS Code. Instead, the prescriptions from the Richmond Ave. Clinic containing the phrases "Cervical collar 2 pcs" and "LSO support", which provided the Defendants with the ability to select a specific type of support that was more highly priced and profitable.

### 2)   The Predetermined Fraudulent Protocol at the 72nd Street Clinic

201.   The Clinic located at 37-23 72nd Street, Jackson Heights, New York (the "72nd Street Clinic") was another of the Clinics where the Defendants conspired with others who are not presently identifiable to obtain medically unnecessary prescriptions for Fraudulent Equipment pursuant to a predetermined fraudulent protocol.

202.   Similar to the Richmond Ave. Clinic, subsequent to their involvement in minor "fender-bender" motor vehicle accidents, many of the Insureds who purportedly received Fraudulent Equipment from RGV Equipment and identified in Exhibit "6" purportedly received treatment from a variety of healthcare professionals at the 72nd Street Clinic.

203.     These Referring Providers included (i) Stanley-Sangwook Kim, D.O. ("Kim") and (ii) Amira Nasser, P.A. ("Nasser").

204.     Kim, though currently a licensed physician, is a convicted felon, and is no stranger to insurance fraud as he was previously convicted of Insurance Fraud in the Third Degree (N.Y. Penal Law § 176.20), a Class D felony, in Queens County Supreme Court.  Following Kim's criminal conviction, Kim entered into a consent order with the New York State Department of Health Board for Professional Medical Conduct, through which: (i) Kim's license to practice medicine in the State of New York was suspended for a period of six months; (ii) Kim was placed on probation by the State Board for Professional Medical Conduct for a period of three years, which Kim completed in August 2020; and (iii) Kim was required to pay a fine of $12,000.00.

205.     Kim and his professional corporation are currently defendants in a case brought by GEICO alleging a no-fault insurance scheme involving Kim and his practice in an illegal referral and kickback arrangement relating to medically unnecessary, excessive, and illusory healthcare services performed and multiple Clinics, including the 72nd Street Clinic.  See, Govt. Emps. Ins. Co., et al. v. Stanley-Sangwook Kim, D.O., et al.; 1:24-cv-01069-RER-TAM (E.D.N.Y. 2024).

206.     In keeping with the fact that the prescriptions purportedly issued by the Referring Providers at the 72nd Street Clinic subsequent to purported initial examinations were not medically necessary and were provided pursuant to the predetermined fraudulent protocol, virtually every Insured who underwent an initial examination was issued a prescription for virtually the same type of Fraudulent Equipment, regardless of which Referring Provider purportedly issued the prescription.

207.    When the Insureds sought treatment with and were purportedly treated by Referring Providers at the 72nd Street Clinic, they did not evaluate each Insured's individual symptoms or presentation to determine whether and what type of DME and/or OD to provide.

208.    Instead, and in keeping with the fact that the prescriptions issued to the Insureds after their initial examinations were not medically necessary and were issued pursuant to predetermined fraudulent protocols, virtually every Insured who underwent an initial examination at the 72nd Street Clinic received a prescription for virtually the same type of Fraudulent Equipment.

209.    Regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, or whether each patient would actually use the Fraudulent Equipment, after a purported initial examination at the 72nd Street Clinic, Referring Providers virtually always prescribed the following Fraudulent Equipment: (i) "Bed board"; (ii) "Egg crate mattress"; (iii) "Cervical collar"; (iv) "Thermal moist heat pad"; and (v) "LSO, Lumbar-sacral orthosis".

210.    To the extent that the Insureds identified in Exhibit "6" returned to the 72nd Street Clinic and purportedly underwent follow-up examinations by a Referring Provider, the Insureds would frequently be provided at least one, and oftentimes two or more additional prescriptions for virtually identical Fraudulent Equipment that were provided to the Defendants.

211.    Regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, each patient's recovery since the accident, or whether each patient would actually use the Fraudulent Equipment, Referring Providers virtually always purportedly prescribed the following Fraudulent Equipment to every

Insured identified in Exhibit "6" that continued treating at the 72nd Street Clinic: (i) "EMS unit four lead"; and (ii) "EMS belt", and would often also prescribe: (iii) "Personal massager".

212.    Furthermore, and in additional to Fraudulent Equipment described above, Referring Providers at the 72nd Street Clinic purportedly also issued separate additional prescriptions for Fraudulent Equipment that virtually always included at least one of following: (i) "LSO w APL control custom"; (ii) "Cervical traction"; (iii) "KO (Custom fitted)"; and/or (iv) "Shoulder immobilizer (Custom fitted)".

213.    In keeping with the fact that the prescriptions for Fraudulent Equipment from the 72nd Street Clinic were fraudulently issued as part of predetermined protocol and without medical necessity, the vast majority of Insureds identified in Exhibits "6" received multiple separate prescriptions for Fraudulent Equipment on a single date that were purportedly issued by a Referring Provider.

214.    Upon information and belief, multiple separate prescriptions were issued to the Insureds on a single date as part of the scheme between the Defendants and unidentifiable third-party individuals to provide the Defendants with the ability to submit separate bills to GEICO for reimbursement of No-Fault Benefits in a way to lower the amount charged to GEICO on each bill so the Defendants could avoid detection of their fraudulent schemes.

215.    In keeping with the fact that the prescriptions for Fraudulent Equipment purportedly issued to Insureds were medically unnecessary and were provided pursuant to a predetermined fraudulent protocol, there was no legitimate reason for Referring Providers to issue multiple prescriptions for Fraudulent Equipment to a single Insured on the same date. The multiple prescriptions for Fraudulent Equipment could have easily been provided on one single prescription as each prescription used the same checkmark-based form containing a list of DME/OD.

216.   In further keeping with the fact that the prescriptions for Fraudulent Equipment purportedly issued to Insureds were medically unnecessary and were provided pursuant to a predetermined fraudulent protocol, when two or more Insureds were involved in the same underlying accident and sought treatment at the 72nd Street Clinic, they each received virtually identical prescriptions for Fraudulent Equipment, despite being situated differently inside the subject motor vehicle, different ages, and in different physical conditions.

217.   For example:

(i)   On April 14, 2022, two Insureds named KL and ML were purportedly involved in a motor vehicle accident. KL and ML both purportedly started treating at the 72nd Street Clinic with Kim on May 5, 2022. After Kim purportedly performed an initial examination of KL and ML, Kim purportedly issued prescriptions in the names of KL and ML that were provided to **RGV Equipment** that included the following Fraudulent Equipment: (i) "Bed board"; (ii) "Egg crate mattress"; (iii) "Cervical collar"; (iv) "Thermal moist heat pad"; and (v) "LSO, Lumbar-sacral orthosis". After Kim purportedly performed follow-up examinations of KL and ML on June 23, 2022, Kim purportedly issued prescriptions in the names of KL and ML that were provided to **RGV Equipment** that included the following Fraudulent Equipment: (i) "EMS unit four lead"; and (ii) "EMS belt". After KL and ML's purported follow-up examinations with Nasser on September 23, 2022, Nasser purportedly issued KL and ML each four separate prescriptions that were all provided to **RGV Equipment** for: (i) "LSO w/APL control custom"; (ii) "Cervical traction"; (iii) "KO (Custom fitted)"; and (iv) "Shoulder immobilizer (Custom fitted) – Rt".

(ii)   On April 21, 2022, two Insureds named AM and KM were purportedly involved in a motor vehicle accident. AM and KM both purportedly started treating at the 72nd Street Clinic with Kim on May 5, 2022 and May 12, 2022 respectively. After Kim purportedly performed an initial examination of AM and KM, Kim purportedly issued prescriptions in the names of AM and KM that were provided to **RGV Equipment** that included the following Fraudulent Equipment: (i) "Bed board"; (ii) "Egg crate mattress"; (iii) "Cervical collar"; (iv) "Thermal moist heat pad"; and (v) "LSO, Lumbar-sacral orthosis". After Kim purportedly performed a follow-up examination of KM on June 23, 2022, Kim purportedly issued a prescription in the name of KM that was provided to **RGV Equipment** that included the following Fraudulent Equipment: (i) "EMS unit four lead"; and (ii) "EMS belt".

(iii)    On May 8, 2022, two Insureds named RA and MM were purportedly involved in a motor vehicle accident. RA and MM both purportedly started treating at the 72nd Street Clinic with Kim on May 26, 2022. After Kim purportedly performed an initial examination of RA and MM, Kim purportedly issued prescriptions in the names of RA and MM that were provided to **RGV Equipment** that included the following Fraudulent Equipment: (i) "Bed board"; (ii) "Egg crate mattress"; (iii) "Cervical collar"; (iv) "Thermal moist heat pad"; and (v) "LSO, Lumbar-sacral orthosis".

(iv)    On May 19, 2022, an Insured named JM was purportedly involved in a motor vehicle accident. JM purportedly started treating at the 72nd Street Clinic with Kim on May 26, 2022. After Kim purportedly performed an initial examination of JM, Kim purportedly issued a prescription in the name of JM that was provided to **RGV Equipment** that included the following Fraudulent Equipment: (i) "Bed board"; (ii) "Egg crate mattress"; (iii) "Cervical collar"; (iv) "Thermal moist heat pad"; and (v) "LSO, Lumbar-sacral orthosis".  On July 20, 2022, after a purported follow-up examination with Kim, Kim purportedly issued a prescription in the name of JM that was provided to **RGV Equipment** for: (i) "EMS unit four lead"; (ii) "EMS belt"; and (iii) "Personal massager".  On September 30, 2022, after a purported follow-up examination with Nasser, Nasser purportedly issued two separate prescriptions in the name of JM that were both provided to **RGV Equipment** for: (i) "LSO w/APL control custom"; and (ii) "KO (Custom fitted) – Lt".

(v)    On May 31, 2022, an Insured named AP was purportedly involved in a motor vehicle accident. AP purportedly started treating at the 72nd Street Clinic with Kim on June 2, 2022. After Kim purportedly performed an initial examination of AP, Kim purportedly issued a prescription in the name of AP that was provided to **RGV Equipment** that included the following Fraudulent Equipment: (i) "Bed board"; (ii) "Cervical collar"; (iii) "Thermal moist heat pad"; (iv) "LSO, Lumbar-sacral orthosis"; and (v) "Knee brace".  On July 13, 2022, after a purported follow-up examination with Kim, Kim purportedly issued a prescription in the name of AP that was provided to **RGV Equipment** for: (i) "EMS unit four lead"; (ii) "EMS belt"; and (iii) "Personal massager".  On October 14, 2022, after a purported follow-up examination with Nasser, Nasser purportedly issued four separate prescriptions in the name of AP that were all provided to **RGV Equipment** for: (i) "LSO w/APL control custom"; (ii) "Cervical traction"); (iii) "KO (Custom fitted) – Lt"; and (iv) "KO (Custom fitted) – Rt".

(vi)    On July 3, 2022, an Insured named SR was purportedly involved in a motor vehicle accident. SR purportedly started treating at the 72nd Street Clinic with Kim on July 20, 2022. After Kim purportedly performed an initial examination of SR, Kim purportedly issued a prescription in the name of

SR that was provided to **RGV Equipment** that included the following Fraudulent Equipment: (i) "Bed board"; (ii) "Cervical collar"; (iii) "Thermal moist heat pad"; and (iv) "LSO, Lumbar-sacral orthosis". On August 24, 2022, after a purported follow-up examination with Kim, Kim purportedly issued a prescription in the name of SR that was provided to **RGV Equipment** for: (i) "EMS unit four lead"; (ii) "EMS belt"; and (iii) "Personal massager". On October 21, 2022, after a purported follow-up examination with Nasser, Nasser purportedly issued four separate prescriptions in the name of SR that were all provided to **RGV Equipment** for: (i) "LSO w/APL control custom"; (ii) "Cervical traction"); (iii) "KO (Custom fitted) – Rt"; and (iv) "Shoulder immobilizer (Custom fitted) - Lt".

(vii)    On July 13, 2022, an Insured named AG was purportedly involved in a motor vehicle accident. AG purportedly started treating at the 72nd Street Clinic with Kim on August 10, 2022. After Kim purportedly performed an initial examination of AG, Kim purportedly issued a prescription in the name of AG that was provided to **RGV Equipment** that included the following Fraudulent Equipment: (i) "Egg crate mattress"; (ii) "Cervical collar"; (iii) "Thermal moist heat pad"; and (iv) "LSO, Lumbar-sacral orthosis". On September 7, 2022, after a purported follow-up examination with Kim, Kim purportedly issued a prescription in the name of AG that was provided to **RGV Equipment** for: (i) "EMS unit four lead"; (ii) "EMS belt"; and (iii) "Personal massager". On October 7, 2022, after a purported follow-up examination with Nasser, Nasser purportedly issued two separate prescriptions in the name of AG that were both provided to **RGV Equipment** for: (i) "LSO w/APL control custom"; and (ii) "Cervical traction".

(viii)   On July 16, 2022, two Insureds named HB and LL were purportedly involved in a motor vehicle accident. HB and LL both purportedly started treating at the 72nd Street Clinic with Kim on July 27, 2022. After Kim purportedly performed an initial examination of HB and LL, Kim purportedly issued prescriptions in the names of HB and LL that were provided to **RGV Equipment** that included the following Fraudulent Equipment: (i) "Egg crate mattress"; (ii) "Cervical collar"; (iii) "Thermal moist heat pad"; and (iv) "LSO, Lumbar-sacral orthosis".

(ix)     On July 25, 2022, an Insured named MM was purportedly involved in a motor vehicle accident. MM purportedly started treating at the 72nd Street Clinic with Kim on July 27, 2022. After Kim purportedly performed an initial examination of MM, Kim purportedly issued a prescription in the name of MM that was provided to **RGV Equipment** that included the following Fraudulent Equipment: (i) "Egg crate mattress"; (ii) "Cervical collar"; (iii) "Thermal moist heat pad"; (iv) "LSO, Lumbar-sacral orthosis"; and (v) "Shoulder immobilizer". On August 31, 2022, after a purported follow-up examination with Kim, Kim purportedly issued a prescription in

the name of MM that was provided to **RGV Equipment** for: (i) "EMS unit four lead"; (ii) "EMS belt"; and (iii) "Personal massager".  On September 30, 2022, after a purported follow-up examination with Nasser, Nasser purportedly issued two separate prescriptions in the name of MM that were both provided to **RGV Equipment** for: (i) "LSO w/APL control custom"; and (ii) "Cervical traction".

(x)    On September 18, 2022, an Insured named SS was purportedly involved in a motor vehicle accident. SS purportedly started treating at the 72nd Street Clinic with Nasser on October 7, 2022. After Nasser purportedly performed an initial examination of SS, Nasser purportedly issued a prescription in the name of SS that was provided to **RGV Equipment** that included the following Fraudulent Equipment: (i) "Bed board"; (ii) "Egg crate mattress"; (iii) "Cervical collar"; (iv) "Thermal moist heat pad"; and (v) "LSO, Lumbar-sacral orthosis".  On November 18, 2022, after a purported follow-up examination with Nasser, Nasser purportedly issued a prescription in the name of SS that was provided to **RGV Equipment** for: (i) "EMS unit four lead"; (ii) "EMS belt"; and (iii) "Personal massager".

218.    These are only representative examples.

219.    In fact, virtually all of the Insureds identified in Exhibit "6" that received treatment at the 72nd Street Clinic were issued virtually identical prescriptions for Fraudulent Equipment pursuant to the predetermined fraudulent protocol identified above.

220.    In keeping with the fact that the prescriptions for Fraudulent Equipment provided to the Defendants from the 72nd Street Clinic were medically unnecessary and issued pursuant to a predetermined fraudulent protocol, an overwhelming majority of the Insureds who treated at the 72nd Street Clinic received multiple prescriptions for virtually the same type of Fraudulent Equipment, similar to the examples above, despite the fact that they were involved in relatively minor and low-impact motor vehicle accidents.

221.    Further, and in keeping with the fact that the prescriptions for Fraudulent Equipment provided to the Defendants by Referring Providers at the 72nd Street Clinic were not medically necessary and provided pursuant to a predetermined fraudulent protocol, the Referring Providers who purportedly issued the prescriptions for Fraudulent Equipment virtually never had

contemporaneously dated medical records, such as an examination report, that identified the Fraudulent Equipment listed on the prescriptions that the Defendants used to support the charges identified in Exhibits "6".

222.   Also, and in keeping with the fact that the prescriptions for Fraudulent Equipment from the 72nd Street Clinic were not medically necessary and issued pursuant to a predetermined fraudulent protocol, to the extent the contemporaneous medical records did identify any of the Fraudulent Equipment, the records did not contain any sufficient information to explain why any of the prescribed Fraudulent Equipment was medically necessary or how it would help the Insureds.

223.   Furthermore, and in keeping with the fact that the prescriptions for Fraudulent Equipment provided to the Defendants were not medically necessary and were issued pursuant to a predetermined fraudulent protocol, to the extent that prescriptions for Fraudulent Equipment were contemporaneously dated with follow-up examinations, the Referring Providers' follow-up examination reports never referenced or discussed the Insureds' previously prescribed Fraudulent Equipment.

224.   Even more, and in keeping with the fact that the prescriptions for Fraudulent Equipment were not medically necessary and were issued pursuant to a predetermined fraudulent protocol, when the Insureds continued to seek treatment at the 72nd Street Clinic, the follow-up examination reports generated by the Referring Providers virtually never referenced or discussed the Insureds' previously prescribed Fraudulent Equipment, and virtually never provided any indication whether to continue using any of previously prescribed Fraudulent Equipment.

225.     In further support of the fact that the prescriptions for Fraudulent Equipment were not medically necessary and were issued pursuant to a predetermined fraudulent protocol, many of the prescriptions purportedly issued by Nasser contained photocopied signatures.

226.     Additionally, the prescriptions purportedly issued by Referring Providers at the 72nd Street Clinic were never given to the Insureds but were routed directly to the Defendants, thus taking any risk out of the equation that an Insured would fill the prescription from an outside source or not fill all or part of the prescription. In fact, in many cases, the Insureds were provided with Fraudulent Equipment directly from receptionists at the 72nd Street Clinic, without any interaction with or instruction concerning their use from the Defendants or a healthcare provider.

227.     As also part of the fraudulent scheme, the prescriptions purportedly issued by Referring Providers at the 72nd Street Clinic were purposefully generic and vague so as to allow the Defendants to choose the specific type of Fraudulent Equipment that they purported to provide Insureds and bill GEICO and other New York automobile insurers, in order to increase their financial gain.

228.     By way of example, rather than specifying the type of cervical collar and lumbosacral support that patients should receive by providing a specific HCPCS Code – or a detailed description that could only be associated with one type of HCPCS Code – the Referring Providers at the 72nd Street Clinic, purported to issue prescriptions containing the phrase "LSO, Lumbar-sacral orthosis" and "Cervical collar" with the intent of enabling the Defendants to select a specific type of support that was more highly priced and profitable, instead of issuing prescriptions for support braces that were actually needed in the first instance, to the extent they were actually needed at all.

   **F.     The Improper Distribution of Fraudulent Equipment to Insureds by the Defendants Without Valid Prescriptions**

229.    As a threshold matter, for a prescription to be valid it must first actually be issued by a licensed healthcare provider who has determined that such a prescription is medically necessary.

230.    However, many of the prescriptions for Fraudulent Equipment purportedly issued by Referring Providers from the Clinics were not valid prescriptions, as they routinely: (i) contained a photocopied signature of the Referring Provider; (ii) contained a signature stamp of the Referring Provider; or (iii) were not referenced or explained in any contemporaneous medical record.

231.    In addition, the DME Providers are not licensed medical professional corporations, and the Paper Owner Defendants are not licensed to prescribe DME or OD to Insureds. As such, the Defendants were not lawfully permitted to prescribe or otherwise determine what DME or OD is medically necessary for the Insureds. For the same reason, the Defendants cannot properly dispense DME or OD to an Insured without a valid prescription from a licensed healthcare professional that definitively identifies medically necessary DME and/or OD to be provided.

232.    However, as part of the fraudulent scheme, in many of the fraudulent claims identified in Exhibits "1" – "6", the Defendants improperly decided what DME and OD to provide to Insureds without a valid definitive prescription from a licensed healthcare provider, to the extent that they actually provided any DME or OD to the Insureds.

233.    More specifically, the prescriptions for DME and/or OD purportedly issued by the Referring Providers and provided to the Defendants did not definitively identify medically necessary DME and/or OD to be provided to the Insureds. For example, the prescriptions did not: (i) provide a specific HCPCS Code for the DME and/or OD to be provided; or (ii) provide sufficient detail to direct the Defendants to a unique type of DME and/or OD.

234.  To the extent that some of the fraudulent claims identified in Exhibits "1" - "6" were based upon prescriptions that contained HCPCS Codes next to the descriptions of DME and/or OD, the prescriptions were still vague as the HCPCS Code identified on the prescription did not correspond with the description next to the code, or the Defendants simply ignored the HCPCS Code listed on the prescription and provided an item with a different HCPCS Code.

235.  While the prescriptions purportedly issued by the Referring Providers did not identify a specific type of medically necessary DME and/or OD for the Insureds, the Defendants did not obtain any additional documentation from the Referring Providers approving or otherwise acknowledging that specific types of DME and/or OD – either by HCPCS Code or a detailed description – was medically necessary for the Insureds.

236.  These vague and generic prescriptions purportedly issued by the Referring Providers were intended to and actually provided the Defendants with the opportunity to select from among several different pieces of Fraudulent Equipment, each having varying reimbursement rates in the Medicaid Fee Schedule.

237.  In addition, in many of the fraudulent claims identified in Exhibits "1" – "6", the Defendants improperly decided what DME and OD to provide to Insureds without a valid definitive prescription from a licensed healthcare provider because the Defendants provided Fraudulent Equipment that was not identified on the prescription.

238.  In a legitimate clinical setting, when a DME/OD Supplier obtains a prescription that does not contain a HCPCS Code or a sufficient description to identify a specific item of DME and/or OD, the DME/OD Supplier contacts the referring healthcare provider to request clarification on the specific items that were being requested, including the features and requirements to dispense the appropriate DME and/or OD prescribed to each patient.

239.    As also part of a legitimate clinical setting, the DME/OD Supplier would have the referring healthcare provider sign documentation to confirm that the specific item of DME and/or OD – identified by HCPCS Code or a detailed description – was medically necessary for the patient.

240.    Upon information and belief, the Defendants never contacted the referring healthcare provider to seek instruction and/or clarification, but rather made their own determination as to the specific Fraudulent Equipment purportedly provided to each Insured. Not surprisingly, the Defendants each elected to provide the Insureds with Fraudulent Equipment that had a reimbursement rate in the higher-end of the permissible range under the Medicaid Fee Schedule.

241.    For example, and as part of the Defendants' common scheme and operation under the control of the Secret Owner, each of the Defendants improperly decided what DME/OD to provide Insureds – to the extent any items were actually provided – without a valid definitive prescription from a licensed healthcare provider involved, as shown above, for every prescription containing a vague description of a "Lumbosacral support (LSO)" or "LSO (Lumbosacral back support)".

242.    The prescriptions from the Referring Providers containing descriptions "Lumbosacral Support", "Lumbo Sacral Orthosis", or "LSO Support" without identifying HCPCS Codes, correspond to over 20 different unique HCPCS Codes, each with its own distinguishing features and maximum reimbursable amount that can be dispensed to Insureds.

243.    As unlicensed individuals in regard to the prescribing of DME and/or OD items to patients, the Defendants were not legally permitted to determine which of the above-available options were medically necessary for each Insured based upon a vague prescription for a

"Lumbosacral Support", "Lumbo Sacral Orthosis", "LSO Support", or "LSO, Lumbar-sacral orthosis".

244.    However, the Defendants never contacted the Referring Provider, and instead decided themselves which specific type of Fraudulent Equipment they would bill GEICO for, and accordingly purportedly provide the Insureds based upon the vague and generic prescriptions for Fraudulent Equipment.

245.    In fact, every time that each of the six DME Providers received a prescription from the Referring Providers for a "Lumbosacral support", "Lumbo sacral orthosis", "LSO Support", or "LSO, Lumbar-sacral orthosis", the Defendants al billed GEICO using HCPCS Code L0650 requesting a reimbursement of $741.59, and thereby asserted that they provided the Insureds with that specific item, which resulted in needlessly inflated charges to GEICO.

246.    Furthermore, each and every time that each of the DME Providers received a prescription from the Referring Providers for a "LSO w/ APL Control custom", "LSO w/ APL Control", or "Custom LSO", the Defendants billed GEICO using HCPCS Code L0632 requesting a reimbursement of $1,150.00, and thereby asserted that they provided the Insureds with that specific item, which resulted in further needlessly inflated charges to GEICO.

247.    Additionally, and as part of the Defendants' common scheme and the control by the Secret Owner, each and every time that each of the DME Providers received a prescription from the Referring Providers for a "KO (Custom fitted)", the Defendants chose to supply and bill GEICO using HCPCS Code L1832 requesting a reimbursement of $607.55, despite the Fee Schedule containing 20 different types of knee orthoses.

248.    These are only representative examples. To the extent that the Defendants actually provided any Fraudulent Equipment, they improperly prescribed the Fraudulent Equipment for

virtually all of the claims identified in Exhibits "1" – "6" that are based upon vague and generic prescriptions because the Defendants decided which specific items of DME and/or OD to provide the Insureds.

249.    The Fraudulent Equipment provided to the Insureds identified in Exhibits "1" – "6" – to the extent that any was actually provided – by the Defendants was not based on: (i) prescriptions by licensed healthcare providers containing sufficient detail to identify unique types DME and/or OD; or (ii) a determination by a licensed healthcare provider that the specific items dispensed to the Insureds were medically necessity. Rather, the Fraudulent Equipment identified in Exhibits "1" – "6" were the result of decisions made by the Defendants.

250.    In all the claims identified in Exhibits "1"- "6" that were based upon vague and generic language contained in the prescriptions, the Defendants falsely represented that the Fraudulent Equipment purportedly provided to Insureds was based upon prescriptions for reasonable and medically necessary DME and/or OD issued by healthcare providers with lawful authority to do so. To the contrary, the Fraudulent Equipment was purportedly provided by the Defendants own determination of what unique types of Fraudulent Equipment to purportedly provide, and, thus, was not eligible for reimbursement of PIP Benefits.

**G.    The Defendants' Fraudulent Billing for DME and/or OD**

251.    As part of the Defendants' common scheme, the bills submitted to GEICO and other New York automobile insurers by the Defendants were also fraudulent in that they each made virtually identical misrepresentations in the DME and OD purportedly provided to the Insureds.

252.    In the bills and other documents submitted to GEICO, the Defendants knowingly misrepresented that the prescriptions relating to Fraudulent Equipment were based upon some

legitimate arms-length relationship, when the prescriptions for Fraudulent Equipment were based upon the unlawful financial arrangements between the Defendants and others who are not presently identifiable.

253.    In the bills and other documents submitted to GEICO, the Defendants also misrepresented that the prescriptions relating to Fraudulent Equipment were for reasonable and medically necessary items when the prescriptions for Fraudulent Equipment were based – not upon medical necessity but – solely on predetermined fraudulent protocols due to unlawful financial arrangements between the Defendants and others who are presently unidentifiable.

254.    Further, the Defendants misrepresented in the bills submitted to GEICO that the Fraudulent Equipment purportedly provided to Insureds were based upon prescriptions issued by licensed healthcare providers authorized to issue such prescriptions, when the Fraudulent Equipment purportedly provided were based upon decisions made by laypersons.

255.    Moreover, and as explained below, the bills submitted to GEICO by the Defendants each misrepresented, to the extent that any Fraudulent Equipment was provided: (i) the Fee Schedule items matched the HCPCS Codes identified in the bills to GEICO, when they did not; and (ii) the charges for Non-Fee Schedule items were for permissible reimbursement rates, when they were not.

256.    Thereafter, in an attempt to conceal their scheme to fraudulently bill GEICO for DME/OD purportedly provided to GEICO's Insureds, the Defendants would submit multiple bills to GEICO for Fraudulent Equipment to make it appear as though Fraudulent Equipment was delivered to Insureds over the course of several days, when the Fraudulent Equipment was actually provided to the Insureds on a single day from the Clinic.

257.     The Defendants each split the Fraudulent Equipment purportedly provided to the Insureds across multiple bills to conceal the extent of the fraudulent charges billed to GEICO.

### 1)     The Defendants' Fraudulently Misrepresented the Fee Schedule items Purportedly Provided

258.     When the Defendants' submitted bills to GEICO seeking payment for Fraudulent Equipment, each of the bills contained HCPCS codes that were used to describe the type of Fraudulent Equipment purportedly provided to the Insureds.

259.     By submitting bills to GEICO containing specific HCPCS Codes, the Defendants each represented that the Fraudulent Equipment purportedly provided to Insureds appropriately corresponded to the HCPCS Codes contained within each bill.

260.     With the exception of codes relating to positioning pillows/cushions under HCPCS Code E0190 and electric heating pads under HCPCS Code E0215, in virtually all of the bills submitted to GEICO for Fee Schedule items, the Defendants fraudulently represented to GEICO that the HCPCS Codes were accurate and appropriate for the Fee Schedule items purportedly provided to the Insureds – to the extent that any Fraudulent Equipment was actually provided.

261.     The prescriptions from the healthcare providers contained vague and generic terms for Fraudulent Equipment to be provided to the Insureds. By contrast, the Defendants each submitted bills to GEICO containing identical HCPCS codes that represented a more expensive tier of Fee Schedule items than necessary and that could be provided based upon the type of equipment identified in the vague and generic prescriptions.

262.     As indicated above, as part of the unlawful financial arrangements between the Defendants and others who are not presently identifiable, the Defendants were provided with prescriptions purportedly issued by the Referring Providers pursuant to predetermined fraudulent

protocols, which provided the Defendants with the opportunity to increase the amount they could bill GEICO for Fraudulent Equipment purportedly provided to the Insureds.

263.    Accordingly, the Defendants obtained vague and generic prescriptions for Fraudulent Equipment that permitted them to choose between multiple types of products that would fit the vague description contained on the prescription.

264.    Although several options were available to the Defendants based upon the vague and generic prescriptions, the Defendants virtually always billed GEICO – and likely other New York automobile insurers – using HCPCS Codes with higher reimbursement amounts than necessary, which was done so for their financial benefit.

265.    However, despite billing for Fee Schedule items using HCPCS Codes that had higher than necessary reimbursement amounts, to the extent that the Defendants provided any Fraudulent Equipment, the HCPCS codes in the bills submitted to GEICO severely misrepresented the type of Fee Schedule items purportedly provided to the Insureds.

266.    As identified in the claims contained within Exhibits "1" – "6", each of the Defendants routinely submitted bills to GEICO for Fraudulent Equipment that was purportedly "custom fitted" or "custom fabricated" for each Insured when – to the extent that the Fraudulent Equipment was actually provided to the Insureds – the Defendants never customized the Fraudulent Equipment as billed.

267.    For example, each of the Defendants used the vague and generic language in the prescriptions purportedly issued from the Referring Providers to bill GEICO for purportedly providing lumbar orthoses using HCPCS Code L0632 with a charge of $1,150.00, and knee orthoses using HCPCS Code L3671 with a charge of $690.23, and HCPCS Code L3674 with a

charge of $896.92. These items require that the orthosis be custom fabricated specifically for each patient, and the customization must be done by a certified orthotist.

268.     Similarly, each of the Defendants also billed GEICO for purportedly providing knee orthoses using HCPCS Code L1832 with a charge of $607.55 and cervical collars using HCPCS Code L0180 with a charge of $233.00, when both of these HCPCS codes require that the item be custom fit for each patient, and that customization must be done by a certified orthotist.

269.     However, despite billing GEICO – and other New York automobile insurers – using HCPCS Codes L0632, L03671, L3674, L1832, and L0180, the specific Fraudulent Equipment provided by the Defendants – to the extent that the Defendants provided the Insureds with any Fraudulent Equipment – did not contain the requirements set forth in HCPCS Codes L0632, L03671, L3674, L1832, and L0180 because – at a minimum – the items were never customized to fit each patient.

270.     In keeping with the fact that the claims identified in Exhibits "1" - "6" for custom-fitted OD, including the claims for HCPCS Codes L0632, L03671, L3674, L1832, and L0180 fraudulently misrepresented that the Defendants satisfied all the requirements for the billed HCPCS Codes, the Defendants did not, and could not have, custom fit or fabricated the Fraudulent Equipment as required under the HCPCS Code.

271.     To the extent that any of the charges identified in Exhibits "1" - "6" for custom-fitted OD, including the claims for L0632, L03671, L3674, L1832, and L0180 were provided, none of the Defendants ever customized the equipment as required by Palmetto.

272.     To help clarify the term "custom fitted", Palmetto defined a custom fitted orthotic as something that "requires more than minimal self-adjustment at the time of delivery in order to provide an individualized fit, i.e., the item must be trimmed, bent, molded (with or without heat),

or otherwise modified resulting in alterations beyond minimal self-adjustment." See Palmetto, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

273.    One of the key factors in identifying a "custom-fitted" orthotic is whether the item requires "minimal self-adjustment" or "substantial modification." Minimum self-adjustment, which is for off-the-shelf orthotic means that "the beneficiary, caretaker for the beneficiary, or supplier of the device can perform and that does not require the services of a certified orthotist (that is, an individual who is certified by the American Board for Certification in Orthotics and Prosthetics, Inc., or by the Board for Orthotist/Prosthetist Certification) or an individual who has specialized training. For example, adjustment of straps and closures, bending or trimming for final fit or comfort (not all-inclusive) fall into this category." See Palmetto, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

274.    By contrast, a substantial modification, which is required for a custom-fitted orthotic, is defined as "changes made to achieve an individualized fit of the item that requires the expertise of a certified orthotist or an individual who has equivalent specialized training in the provision of orthotics such as a physician, treating practitioner, an occupational therapist, or physical therapist in compliance with all applicable Federal and State licensure and regulatory requirements. A certified orthotist is defined as an individual who is certified by the American Board for Certification in Orthotics and Prosthetics, Inc., or by the Board for Orthotist/Prosthetist Certification." See Palmetto, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

275.     In the claims identified in Exhibits "1" - "6" for custom-fitted OD, including the claims for L0632, L03671, L3674, L1832, and L0180, each of the Defendants fraudulently misrepresented that they provided the Insureds with OD that was custom-fitted or custom-fabricated as defined by Palmetto, by a certified orthotist.

276.     Instead, to the extent that the Defendants provided any Fraudulent Equipment billed to GEICO as custom-fitted OD, including the charges for L0632, L03671, L3674, L1832, and L0180, the Fraudulent Equipment was provided without taking any action to custom-fit the OD to the Insureds. To the extent that the Defendants attempted to make any adjustments to the DME received by Insureds identified in Exhibits "1" - "6", the Defendants only provided minimal self-adjustment, as defined by Palmetto, which only supports charges for off-the-shelf items.

277.     In keeping with the fact that the Defendants misrepresented that they custom-fitted OD purportedly provided to Insureds and billed to GEICO, the Paper Owner Defendants are not certified orthotists and did not complete sufficient training to become a certified orthotist.

278.     In addition to the Defendants collectively submitting over 1,100 charges for custom fit or custom fabricated OD, and as part of the fraudulent scheme between the Defendants, each of the Defendants in a virtually identical manner fraudulently misrepresented other Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided – and billed to GEICO in order to maximize profits.

279.     The claims identified in Exhibits "1" - "6" for HCPCS Code E0272 is another example of how, as part of their common scheme, each of the Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided.

280.    Each of the claims identified within Exhibits "1" - "6" for HCPCS Code E0272 contained a charge for $155.52 based upon prescriptions for an "Egg crate mattress" or "Eggcrate mattress".

281.    However, the product represented by HCPCS Code E0272 is defined as a foam rubber mattress, which is an actual full-size mattress, not a mattress topper or pad in the shape of an egg crate.

282.    Despite billing GEICO – and other New York automobile insurers – using HCPCS Code E0272, the items provided by the Defendants – to the extent that the Defendants provided the Insureds with any item – were not foam rubber mattresses as required by HCPCS Code E0272.

283.    By contrast, to the extent that any items were provided, they were mattress pads or toppers in the shape of egg crates, not an actual mattress. Mattress pads are Fee Schedule items listed under HCPCS Code E0199, which is defined as a "Dry pressure pad for mattress, standard mattress length and width."

284.    Unlike the fraudulent charges for $155.52 for each eggcrate mattress billed under HCPCS Code E0272 – and in keeping with the fact that the fraudulent charges were part of the Defendants' common scheme to defraud GEICO and other automobile insurers – the Fee Schedule sets a maximum reimbursement rate of $19.48 for each mattress pad/topper billed under HCPCS Code L0199.

285.    In each of the claims identified within Exhibits "1" - "6" where the Defendants billed for Fraudulent Equipment under HCPCS Code E0272, each of the bills fraudulently misrepresented that the Defendants provided the Insureds with equipment that satisfies the requirements of HCPCS Code E0272.

286.    The claims identified in Exhibits "1" - "6" for HCPCS Code E0274 is another example of how, as part of their common scheme, each of the Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided.

287.    Each of the claims identified within Exhibits "1" - "6" for HCPCS Code E0274 contained a charge for $101.85 based upon prescriptions for an "bed board".

288.    However, the product represented by HCPCS Code E0274 is defined as an over-bed table and is a table akin to those found in hospitals that permit a bed-bound individual the use of a table while confined to a bed.

289.    Despite billing GEICO – and other New York automobile insurers – using HCPCS Code E0274, the items provided by the Defendants – to the extent that the Defendants provided the Insureds with any item – were not over-bed tables as required by HCPCS Code E0274.

290.    By contrast, to the extent that any items were provided, they were bed boards, or large, flat pieces of cardboard that are placed under a mattress to make the mattress firmer and can keep the mattress from sinking. A bed board is listed under HCPCS Code E0273, which is a Non-Fee Schedule Item.

291.    As a Non-Fee Schedule Item, the reimbursement for HCPCS Code E0273 is the lesser of either 150% of the acquisition cost to the Defendants or the cost to the general public.

292.    GEICO was able to determine that bed boards are available for purchase to the general public on websites like Walmart.com for $22.99.

293.    Unlike the fraudulent charges for $101.85 for each bed board billed under HCPCS Code E0274 – and in keeping with the fact that the fraudulent charges were part of the Defendants'

common scheme to defraud GEICO and other automobile insurers – as a Non-Fee Schedule Item the Defendants could charge no more than $22.99 under HCPCS Code E0273.

294.    In each of the claims identified within Exhibits "1" - "6" where the Defendants billed for Fraudulent Equipment under HCPCS Code E0274, each of the bills fraudulently misrepresented that the Defendants provided the Insureds with equipment that satisfies the requirements of HCPCS Code E0274.

295.    The claims identified in Exhibits "1" - "6" for HCPCS Code E0480 is another example of how, as part of their common scheme, each of the Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided.

296.    Each of the claims identified within Exhibits "1" - "6" for HCPCS Code E0480 contained a charge of $355.56 based upon prescriptions for a "massager".

297.    However, the product represented by HCPCS Code E0480 is defined as airway clearance device percussor, which is used to help prevent aspiration in a patient by clearing excessive mucus and are typically prescribed to patients diagnosed with cystic fibrosis, chronic bronchitis, muscular dystrophy or who have other conditions which inhibit a patient's ability to expectorate.

298.    Despite billing GEICO – and other New York automobile insurers – using HCPCS Code E0480, the items provided by the Defendants – to the extent that the Defendants provided the Insureds with any item – were not airway clearance devices as required by HCPCS Code E0480.

299.    By contrast, to the extent that any items were provided, they were personal massagers.  Personal massagers are Non-Fee Schedule items, which should have been billed under HCPCS Code E1399.

300.    As a Non-Fee Schedule Item, the reimbursement for HCPCS Code E1399 is the lesser of either 150% of the acquisition cost to the Defendants or the cost to the general public.

301.    In each of the claims identified within Exhibits "1" - "6" where the Defendants billed for Fraudulent Equipment under HCPCS Code E0480, each of the bills fraudulently misrepresented that the Defendants provided the Insureds with equipment that satisfies the requirements of HCPCS Code E0480.

302.    With the exception of the claims identified using HCPCS Codes E0190 and E0215, in each of the claims for Fee Schedule items identified within Exhibits "1" - "6", to the extent that any Fraudulent Equipment was actually provided, the Defendants fraudulently misrepresented the HCPCS Codes identified in their billing to GEICO in order to increase the amount of No-Fault Benefits they could obtain, and were therefore not eligible to collect No-Fault Benefits in the first instance.

### 2)  The Defendants' Fraudulently Misrepresented the Rate of Reimbursement for Non-Fee Schedule Items

303.    When the Defendants submitted bills to GEICO for Non-Fee Schedule items, the Defendants requested reimbursement rates that were unique and purportedly based upon the specific Fraudulent Equipment purportedly provided to Insureds.

304.    As indicated above, under the No-Fault Laws, Non-Fee Schedule items are reimbursable as the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the same item.

305.     By submitting bills to GEICO for Non-Fee Schedule items, the Defendants represented that they requested permissible reimbursement amounts that were calculated as the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the specific item.

306.     However, in virtually all of the charges to GEICO identified in Exhibits "1" - "6" for Non-Fee Schedule items, each of the Defendants fraudulently represented to GEICO that the reimbursement sought was the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the same item.

307.     Instead, the Defendants submitted bills to GEICO with charges that significantly inflated the permissible reimbursement amount of Non-Fee Schedule items in order to maximize the amount of No-Fault Benefits they were able to obtain from GEICO and other automobile insurers.

308.     The Defendants were able to perpetrate this scheme to fraudulently overcharge Non-Fee Schedule items by providing Insureds – to the extent they actually provided any Fraudulent Equipment – with low-cost and low-quality Fraudulent Equipment.

309.     When the Defendants submitted bills to GEICO seeking No-Fault Benefits for Non-Fee Schedule items, the charges fraudulently represented 150% of the Defendants' acquisition cost of purportedly high-quality items. In actuality, the Defendants' legitimate acquisition cost for the low-quality items were significantly less.

310.     In keeping with the fact that the Defendants fraudulently represented the permissible reimbursement amounts in the bills submitted to GEICO for the Non-Fee Schedule items solely for their financial benefit, the Defendants purposefully attempted to conceal their

effort to overcharge GEICO for Non-Fee Schedule items by never submitting a copy of their acquisition invoices in conjunction with their bills.

311.    The Defendants did not include invoices showing their legitimate cost to acquire the low-cost and low-quality Non-Fee Schedule items in the bills submitted to GEICO because the invoices would have shown that the permissible reimbursement amounts were significantly less than the charges contained in the bills.

312.    As part of this scheme, the charges submitted to GEICO for Non-Fee Schedule items identified in Exhibits "1" - "6" virtually always misrepresented the permissible reimbursement amount.

313.    For example, the Defendants collectively billed GEICO for over 200 infrared heat lamps under HCPCS Code E0205 with a charge of between $317.27 to 385.47 per unit that was falsely represented as a permissible reimbursement amount for the Non-Fee Schedule item.

314.    To the extent that any items were provided, the infrared lamps were low quality items and the permissible reimbursement rate was significantly less than the $317.27 to 385.47 charged by the Defendants.

315.    In all of the charges submitted to GEICO for infrared heat lamps under HCPCS Code E0205, the Defendants fraudulently sought reimbursement for between $317.27 to 385.47 per unit when the maximum reimbursement charge significantly less.

316.    The Defendants also collectively billed GEICO for over 290 EMS units under HCPCS Code E0745 with each Defendant charging $375.40 per unit that was falsely represented as a permissible reimbursement amount for the Non-Fee Schedule item.

317.     To the extent that any items were provided, the EMS units were low quality items and the permissible reimbursement rate was significantly less than the $375.40 charged by the Defendants.

318.     In virtually all of the charges submitted to GEICO for EMS units, the Defendants fraudulently sought reimbursement for $375.40 per unit when the maximum reimbursement charge was significantly less.

319.     These are only representative examples. In each of the claims identified within Exhibits "1" - "6" for Non-FeeSchedule items, each of the Defendants fraudulently misrepresented in the bills submitted to GEICO that the charges were not in the Medicaid Fee Schedule and were the lesser of 150% of the acquisition cost or the cost to the general public. Therefore, the Defendants were not eligible to collect No-Fault Benefits in the first instance.

**III.     The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO**

320.     To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of NF-3 forms, HCFA-1500 forms, and/or treatment reports to GEICO through and in the name of the DME Providers, seeking payment for Fraudulent Equipment.

321.     The NF-3 forms, HCFA-1500 forms and treatment reports that the Defendants submitted or caused to be submitted to GEICO were false and misleading in the following material respects:

> (i)     The NF-3 forms, HCFA-1500 forms, treatment reports, prescriptions, and delivery receipts uniformly misrepresented to GEICO that the Defendants provided Fraudulent Equipment pursuant to prescriptions by licensed healthcare providers for reasonable and medically necessary DME and/or OD, and therefore were eligible to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because, to the extent that the Defendants provided any of Fraudulent Equipment, they were

not properly licensed by the DCWP as they falsified the information contained in their applications for a Dealer for Products License.

(ii)    The NF-3 forms, HCFA-1500 forms, and prescriptions uniformly misrepresented to GEICO that the Defendants provided Fraudulent Equipment pursuant to prescriptions by licensed healthcare providers for reasonable and medically necessary DME and/or OD, and therefore were eligible to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because, to the extent that the Defendants provided any of Fraudulent Equipment, it was based upon: (a) unlawful financial arrangements with others who are not presently identifiable; (b) predetermined fraudulent protocols without regard for the medical necessity of the items; and (c) decisions made by laypersons not based upon lawful prescriptions from licensed healthcare providers for medically necessary items.

(iii)   The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented to GEICO that the Defendants provided Fraudulent Equipment that directly corresponded to the HCPCS Codes contained within each form, and therefore were eligible to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because – to the extent that the Defendants provided any Fraudulent Equipment to the Insureds – Fraudulent Equipment did not meet the specific requirements for the HCPCS Codes identified in the NF-3 forms, HCFA-1500 forms, and treatment notes.

(iv)    The NF-3 forms, HCFA-1500 forms, and treatment reports, prescriptions, and delivery receipts uniformly misrepresented to GEICO the reimbursement amount for the Non-Fee Schedule items provided to the Insureds, to the extent that the Defendants provided any Fraudulent Equipment, and therefore were eligible to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because – to the extent that the Defendants provided any Fraudulent Equipment to the Insureds – falsified the permissible reimbursement amounts for Fraudulent Equipment identified in the NF-3 forms, HCFA-1500 forms, and treatment notes.

## IV.    **The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

322.    The Defendants were legally and ethically obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

323.    To induce GEICO to promptly pay the fraudulent charges for Fraudulent Equipment, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

324.    Specifically, they knowingly misrepresented that they were lawfully licensed by the City of New York as they never complied with regulations requiring the DME Providers to obtain a Dealer in Products License from the DCWP because the Paper Owner Defendants falsely indicated, under penalty for false statements, in the application for a Dealer in Products License the common ownership by the Secret Owner of each of the DME Providers, and concealed these misrepresentations in order to submit bills to GEICO and prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

325.    The Defendants also knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment were – not based upon medical necessity but – the result of unlawful financial arrangements, were provided to the Defendants, and ultimately used as the basis to submit bills to GEICO to prevent GEICO from discovering that Fraudulent Equipment was billed to GEICO for financial gain.

326.    Additionally, the Defendants knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment provided to the Defendants were – not based upon medical necessity but – based upon predetermined fraudulent protocols and ultimately used as the basis to submit bills to GEICO in order to prevent GEICO from discovering that Fraudulent Equipment was billed to GEICO for financial gain.

327.    Furthermore, the Defendants knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment were based upon decisions made by laypersons who did not have the legal authority to issue medically necessary DME/OD, and not by an actual healthcare

provider's prescription for medically necessary DME/OD, in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

328.    Even more, the Defendants knowingly misrepresented and concealed that the HCPCS Codes for Fraudulent Equipment contained in the bills submitted by the Defendants to GEICO did not accurately reflect the type of Fraudulent Equipment provided to the Insureds in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

329.    Lastly, the Defendants knowingly misrepresented the permissible reimbursement amount of the Non-Fee Schedule items contained in the bills submitted by the Defendants to GEICO and did not include any invoices to support the charges in order to prevent GEICO from discovering that Non-Fee Schedule items were billed to GEICO for financial gain as part of a common fraudulent scheme.

330.    Once GEICO began to suspect that the Defendants were engaged in fraudulent billing and treatment activities, GEICO requested that they submit additional verification, including but not limited to, examinations under oath to determine whether the charges submitted through the Defendants were legitimate.

331.    The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

332.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO

incurred damages of more than $761,000.00 based upon the fraudulent charges representing payments made by GEICO to the Defendants.

333.    Based upon the Defendants' material misrepresentations, omissions, and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**FIRST CAUSE OF ACTION**
**Against All City Supply, Irbo Supply, Easy Way Supply, Soan Supply, XL Supply, and RGV Equipment**
**(Declaratory Judgment, 28 U.S.C. §§ 2201 and 2202)**

334.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

335.    There is an actual case in controversy between GEICO and each of the DME Providers regarding more than $545,000.00 in fraudulent billing that has been submitted to GEICO in the names of DME Providers.

336.    The DME Providers have no right to receive payment for any pending bills submitted to GEICO because the Defendants did not comply with all local licensing laws as XL Supply never obtained Dealer in Products license and the remaining DME Providers falsified business owners on the applications for Dealer in Products Licenses, and thus, were not properly lawfully licensed by the DCWP as required by regulations from the City of New York.

337.    The DME Providers also have no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO for Fraudulent Equipment were based – not upon medical necessity but – as a result of its participation in unlawful financial arrangements.

338.    The DME Providers have no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO were based – not upon medical necessity but – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants and others who are not presently known, rather than to treat the Insureds.

339.    The DME Providers have no right to receive payment for any pending bills submitted to GEICO because the DME Providers purportedly provided Fraudulent Equipment as a result of decisions made by laypersons, not based upon prescriptions for medically necessary items issued by healthcare providers who are licensed to issue such prescriptions.

340.    The DME Providers have no right to receive payment for any pending bills submitted to GEICO because – to the extent the DME Providers actually provided any Fraudulent Equipment – the DME Providers fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds as the HCPCS Codes identified in the bills did not accurately represent the Fee Schedule items provided to the Insureds.

341.    The DME Providers have no right to receive payment for any pending bills submitted to GEICO because – to the extent the DME Providers provided any Fraudulent Equipment – the DME Providers fraudulently misrepresented that the charges for Non-Fee Schedule items contained within the bills to GEICO were less than or equal to the maximum permissible reimbursement amount.

342.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of All City Supply, Irbo Supply, Easy Way Supply, Soan Supply, XL Supply, and RGV Equipment.

**SECOND CAUSE OF ACTION**
**Against the Paper Owner Defendants and John Doe Defendant "1"**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

343.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

344.    All City Supply, Irbo Supply, Easy Way Supply, Soan Supply, XL Supply, and RGV Equipment together constitute an association-in-fact "enterprise" (the "DME Provider Enterprise"), as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

345.    The members of the DME Provider Enterprise are and have been associated through time, joined in purpose, and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, All City Supply, Irbo Supply, Easy Way Supply, Soan Supply, XL Supply, and RGV Equipment are ostensibly independent businesses – with different names and tax identification numbers – that were used as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent charges to GEICO.

346.    The DME Provider Enterprise operated under six separate names and tax identification numbers in order to limit the time period and volume of bills submitted under any individual name, in an attempt to avoid attracting the attention and scrutiny of GEICO and other New York automobile insurers to the volume of billing and the pattern of fraudulent charges originating from any one business. Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the DME Provider Enterprise acting singly or without the aid of each other.

347.     The DME Provider Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing, overseeing and coordinating many individuals who have been responsible for facilitating and performing a wide variety of administrative and ostensibly professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to GEICO and other insurers), by creating and maintaining patient files and other records, by recruiting and supervising personnel, by negotiating and executing various contracts and/or illegal verbal agreements, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds, and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

348.     The Paper Owner Defendants and John Doe Defendant "1" have each been employed by and/or associated with the DME Provider Enterprise.

349.     Paper Owner Defendants and John Doe Defendant "1" knowingly have conducted and/or participated, directly or indirectly, in the conduct of the DME Provider Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges seeking payments that the DME Provider Enterprise was not eligible to receive under the No-Fault Laws, because:: (i) in every claim, that the DME Providers had lawful Dealer in Products Licenses and were entitled to No-Fault Benefits when in fact none of the DME Providers were lawfully licensed as they knowingly falsified information on their applications for a Dealer in Products License or never obtained a Dealer in Products License; (ii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful

financial arrangements, which were used to financially enrich those that participated in the scheme; (iii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (vi) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibits "1" - "6".

350.    The DME Providers Enterprise's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which the Paper Owner Defendants and John Doe Defendant "1" operated the DME Providers, inasmuch as the DME Providers never operated as a legitimate DME/OD provider, never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential in order for the DME Providers to function. Furthermore, the intricate

planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through the DME Providers to the present day.

351.    The DME Providers Enterprise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other New York automobile insurers. These inherently unlawful acts are taken by the DME Providers Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-fault billing. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $761,000.00 pursuant to the fraudulent bills submitted by the Defendants through the DME Providers Enterprise.

352.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## THIRD CAUSE OF ACTION
### Against the Paper Owner Defendants and the John Doe Defendants
### (Violation of RICO, 18 U.S.C. § 1962(d))

353.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

354.    The DME Providers Enterprise is an association-in-fact "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

355.    The Paper Owner Defendants and the John Doe Defendants are employed by and/or associated with the DME Providers Enterprise.

356.    The Paper Owner Defendants and the John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the DME Providers Enterprise's affairs through a pattern of racketeering activity consisting of repeated

violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that the DME Providers were not eligible to receive under the No-Fault Laws because: (i) in every claim, that the DME Providers had lawful Dealer in Products Licenses and were entitled to No-Fault Benefits when in fact none of the DME Providers were lawfully licensed as they knowingly falsified information on their applications for a Dealer in Products License or never obtained a Dealer in Products License; (ii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; (iii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (vi) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in

part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibits "1" - "6".

357.    The Paper Owner Defendants and the John Doe Defendants knew of, agreed to, and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

358.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $761,000.00 pursuant to the fraudulent bills submitted by Defendants through the DME Providers Enterprise.

359.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**Against Kaplan and John Doe Defendant "1"**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

360.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

361.    All City Supply is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

362.    Kaplan and John Doe Defendant "1" knowingly conducted and/or participated, directly or indirectly, in the conduct of All City Supply's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis since inception seeking payments that All City Supply was not eligible to receive under the New York No-Fault Laws because: (i) in every claim, that All City Supply had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact All City Supply was

not lawfully licensed as they knowingly falsified the business address and owner information on their application for a Dealer in Products; (ii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; (iii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (vi) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

363. All City Supply's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Kaplan and John Doe Defendant "1" operate All City Supply, insofar as All

City Supply is not engaged as a legitimate supplier of DME, and therefore, acts of mail fraud are essential in order for All City Supply to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Kaplan and John Doe Defendant "1" continue to attempt collection on the fraudulent billing submitted by All City Supply to the present day.

364.    All City Supply is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by All City Supply in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

365.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $89,000.00 pursuant to the fraudulent bills submitted through All City Supply.

366.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**Against All City Supply, Kaplan, and John Doe Defendant "1"**
**(Common Law Fraud")**

367.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

368.    All City Supply, Kaplan, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

369.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that All City Supply had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact All City Supply was not lawfully licensed as they knowingly falsified the business address and owner information on their application for a Dealer in Products; (ii) the representation that that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; (iii) the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) the representation that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) the representation that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO, to the extent that any Fraudulent Equipment was actually provided; and (vi) the representation that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount.

370.    All City Supply, Kaplan, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce

GEICO to pay charges submitted through All City Supply that were not compensable under New York no-fault insurance laws.

371.     GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $89,000.00 pursuant to the fraudulent bills submitted by All City Supply, Kaplan, and John Doe Defendant "1".

372.     All City Supply, Kaplan, and John Doe Defendant "1"'s extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

373.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## SIXTH CAUSE OF ACTION
### Against All City Supply, Kaplan, and John Doe Defendant "1"
### (Unjust Enrichment)

374.     GEICO incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

375.     As set forth above, All City Supply, Kaplan, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

376.     When GEICO paid the bills and charges submitted by or on behalf of All City Supply for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

377.     All City Supply, Kaplan, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that All City Supply, Kaplan,

and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

378.    All City Supply, Kaplan, and John Doe Defendant "1"'s retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

379.    By reason of the above, All City Supply, Kaplan, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $89,000.00.

### SEVENTH CAUSE OF ACTION
**Against Bogdanova and John Doe Defendant "1"**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

380.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

381.    Irbo Supply is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

382.    Bogdanova and John Doe Defendant "1" knowingly conducted and/or participated, directly or indirectly, in the conduct of Irbo Supply's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis since inception seeking payments that Irbo Supply was not eligible to receive under the New York No-Fault Laws because: (i) in every claim, that Irbo Supply had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Irbo Supply was not lawfully licensed as they knowingly falsified the business address and owner information on their application for a Dealer in Products; (ii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those

that participated in the scheme; (iii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (vi) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "2".

383.    Irbo Supply's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Bogdanova and John Doe Defendant "1" operate Irbo Supply, insofar as Irbo Supply is not engaged as a legitimate supplier of DME, and therefore, acts of mail fraud are essential in order for Irbo Supply to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the

fact that Bogdanova and John Doe Defendant "1" continue to attempt collection on the fraudulent billing submitted by Irbo Supply to the present day.

384.    Irbo Supply is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Irbo Supply in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

385.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than \$373,000.00 pursuant to the fraudulent bills submitted through Irbo Supply.

386.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**EIGHTH CAUSE OF ACTION**
**Against Irbo Supply, Bogdanova, and John Doe Defendant "1"**
**(Common Law Fraud")**

387.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

388.    Irbo Supply, Bogdanova, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

389.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Irbo Supply had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Irbo Supply was not lawfully licensed as they knowingly falsified the business address and owner information on their application for a Dealer in

Products; (ii) the representation that that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; (iii) the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) the representation that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) the representation that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO, to the extent that any Fraudulent Equipment was actually provided; and (vi) the representation that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount.

390.    Irbo Supply, Bogdanova, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Irbo Supply that were not compensable under New York no-fault insurance laws.

391.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $373,000.00 pursuant to the fraudulent bills submitted by Irbo Supply, Bogdanova, and John Doe Defendant "1".

392.     Irbo Supply, Bogdanova, and John Doe Defendant "1"'s extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

393.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## NINTH CAUSE OF ACTION
### Against Irbo Supply, Bogdanova, and John Doe Defendant "1"
### (Unjust Enrichment)

394.     GEICO incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

395.     As set forth above, Irbo Supply, Bogdanova, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

396.     When GEICO paid the bills and charges submitted by or on behalf of Irbo Supply for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

397.     Irbo Supply, Bogdanova, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Irbo Supply, Bogdanova, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

398.     Irbo Supply, Bogdanova, and John Doe Defendant "1"'s retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

399.     By reason of the above, Irbo Supply, Bogdanova, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $373,000.00.

**TENTH CAUSE OF ACTION**
**Against Satanovskyy and John Doe Defendant "1"**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

400.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

401.    Easy Way Supply is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

402.    Satanovskyy and John Doe Defendant "1" knowingly conducted and/or participated, directly or indirectly, in the conduct of Easy Way Supply's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis since inception seeking payments that Easy Way Supply was not eligible to receive under the New York No-Fault Laws because: (i) in every claim, that Easy Way Supply had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Easy Way Supply was not lawfully licensed as they knowingly falsified the business address and owner information on their application for a Dealer in Products; (ii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; (iii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment were provided pursuant to decisions

from laypersons who are not legally authorized to prescribe DME and/or OD; (v) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (vi) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "3".

403.    Easy Way Supply's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Satanovskyy and John Doe Defendant "1" operate Easy Way Supply, insofar as Easy Way Supply is not engaged as a legitimate supplier of DME, and therefore, acts of mail fraud are essential in order for Easy Way Supply to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Satanovskyy and John Doe Defendant "1" continue to attempt collection on the fraudulent billing submitted by Easy Way Supply to the present day.

404.    Easy Way Supply is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Easy Way Supply in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

405.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $101,000.00 pursuant to the fraudulent bills submitted through Easy Way Supply.

406.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## ELEVENTH CAUSE OF ACTION
### Against Easy Way Supply, Satanovskyy, and John Doe Defendant "1"
### (Common Law Fraud")

407.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

408.    Easy Way Supply, Satanovskyy, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

409.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Easy Way Supply had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Easy Way Supply was not lawfully licensed as they knowingly falsified the business address and owner information on their application for a Dealer in Products; (ii) the representation that that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; (iii) the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon

medical necessity; (iv) the representation that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) the representation that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO, to the extent that any Fraudulent Equipment was actually provided; and (vi) the representation that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount.

410.    Easy Way Supply, Satanovskyy, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Easy Way Supply that were not compensable under New York no-fault insurance laws.

411.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $101,000.00 pursuant to the fraudulent bills submitted by Easy Way Supply, Satanovskyy, and John Doe Defendant "1".

412.    Easy Way Supply, Satanovskyy, and John Doe Defendant "1"'s extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

413.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**TWELFTH CAUSE OF ACTION**
**Against Easy Way Supply, Satanovskyy, and John Doe Defendant "1"**
**(Unjust Enrichment)**

414.    GEICO incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

415.    As set forth above, Easy Way Supply, Satanovskyy, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

416.    When GEICO paid the bills and charges submitted by or on behalf of Easy Way Supply for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

417.    Easy Way Supply, Satanovskyy, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Easy Way Supply, Satanovskyy, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

418.    Easy Way Supply, Satanovskyy, and John Doe Defendant "1"'s retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

419.    By reason of the above, Easy Way Supply, Satanovskyy, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $101,000.00.

**THIRTEENTH CAUSE OF ACTION**
**Against Ishaq and John Doe Defendant "1"**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

420.     GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

421.     Soan Supply is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

422.     Ishaq and John Doe Defendant "1" knowingly conducted and/or participated, directly or indirectly, in the conduct of Soan Supply's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis since inception seeking payments that Soan Supply was not eligible to receive under the New York No-Fault Laws because: (i) in every claim, that Soan Supply had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Soan Supply was not lawfully licensed as they knowingly falsified the business address and owner information on their application for a Dealer in Products; (ii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; (iii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment accurately reflected the HCPCS

Codes contained in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (vi) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "4".

423.    Soan Supply's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Ishaq and John Doe Defendant "1" operate Soan Supply, insofar as Soan Supply is not engaged as a legitimate supplier of DME, and therefore, acts of mail fraud are essential in order for Soan Supply to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Ishaq and John Doe Defendant "1" continue to attempt collection on the fraudulent billing submitted by Soan Supply to the present day.

424.    Soan Supply is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Soan Supply in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

425.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $67,000.00 pursuant to the fraudulent bills submitted through Soan Supply.

426.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**FOURTEENTH CAUSE OF ACTION**
**Against Soan Supply, Ishaq, and John Doe Defendant "1"**
**(Common Law Fraud")**

427.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

428.    Soan Supply, Ishaq, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

429.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Soan Supply had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Soan Supply was not lawfully licensed as they knowingly falsified the business address and owner information on their application for a Dealer in Products; (ii) the representation that that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; (iii) the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) the representation that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) the representation

that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO, to the extent that any Fraudulent Equipment was actually provided; and (vi) the representation that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount.

430.    Soan Supply, Ishaq, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Soan Supply that were not compensable under New York no-fault insurance laws.

431.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $67,000.00 pursuant to the fraudulent bills submitted by Soan Supply, Ishaq, and John Doe Defendant "1".

432.    Soan Supply, Ishaq, and John Doe Defendant "1"'s extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

433.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### FIFTEENTH CAUSE OF ACTION
**Against Soan Supply, Ishaq, and John Doe Defendant "1"**
**(Unjust Enrichment)**

434.    GEICO incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

435.    As set forth above, Soan Supply, Ishaq, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

436.    When GEICO paid the bills and charges submitted by or on behalf of Soan Supply for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

437.    Soan Supply, Ishaq, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Soan Supply, Ishaq, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

438.    Soan Supply, Ishaq, and John Doe Defendant "1"'s retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

439.    By reason of the above, Soan Supply, Ishaq, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $67,000.00.

### SIXTEENTH CAUSE OF ACTION
**Against Kletsova and John Doe Defendant "1"**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

440.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

441.    XL Supply is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

442.    Kletsova and John Doe Defendant "1" knowingly conducted and/or participated, directly or indirectly, in the conduct of XL Supply's affairs through a pattern of racketeering activity

consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis since inception seeking payments that XL Supply was not eligible to receive under the New York No-Fault Laws because: (i) the representation that XL Supply had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact XL Supply was not lawfully licensed as they knowingly falsified the business address and owner information on their application for a Dealer in Products; (ii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; (iii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (vi) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount. The fraudulent billings and corresponding mailings submitted to GEICO

that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "5".

443.    XL Supply's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Kletsova and John Doe Defendant "1" operate XL Supply, insofar as XL Supply is not engaged as a legitimate supplier of DME, and therefore, acts of mail fraud are essential in order for XL Supply to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Kletsova and John Doe Defendant "1" continue to attempt collection on the fraudulent billing submitted by XL Supply to the present day.

444.    XL Supply is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by XL Supply in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

445.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $69,000.00 pursuant to the fraudulent bills submitted through XL Supply.

446.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### SEVENTEENTH CAUSE OF ACTION
**Against XL Supply, Kletsova, and John Doe Defendant "1"**
**(Common Law Fraud")**

447.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

448.    XL Supply, Kletsova, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

449.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that XL Supply had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact XL Supply was not lawfully licensed as they knowingly falsified the business address and owner information on their application for a Dealer in Products; (ii) the representation that that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; (iii) the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) the representation that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) the representation that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO, to the extent that any Fraudulent Equipment was actually provided; and (vi) the representation that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount.

450.     XL Supply, Kletsova, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through XL Supply that were not compensable under New York no-fault insurance laws.

451.     GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $69,000.00 pursuant to the fraudulent bills submitted by XL Supply, Kletsova, and John Doe Defendant "1".

452.     XL Supply, Kletsova, and John Doe Defendant "1"'s extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

453.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## EIGHTEENTH CAUSE OF ACTION
### Against XL Supply, Kletsova, and John Doe Defendant "1"
### (Unjust Enrichment)

454.     GEICO incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

455.     As set forth above, XL Supply, Kletsova, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

456.     When GEICO paid the bills and charges submitted by or on behalf of XL Supply for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

457.    XL Supply, Kletsova, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that XL Supply, Kletsova, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

458.    XL Supply, Kletsova, and John Doe Defendant "1"'s retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

459.    By reason of the above, XL Supply, Kletsova, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $69,000.00.

### NINETEENTH CAUSE OF ACTION
**Against Rogov and John Doe Defendant "1"**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

460.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

461.    RGV Equipment is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

462.    Rogov and John Doe Defendant "1" knowingly conducted and/or participated, directly or indirectly, in the conduct of RGV Equipment's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis since inception seeking payments that RGV Equipment was not eligible to receive under the New York No-Fault Laws because: (i) in every claim, that RGV Equipment had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact RGV Equipment was not lawfully licensed as they knowingly falsified the business address and owner information on their application for a Dealer in Products; (ii) in every claim, that the prescriptions for Fraudulent

Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; (iii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (vi) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "6".

463.    RGV Equipment's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Rogov and John Doe Defendant "1" operate RGV Equipment, insofar as RGV Equipment is not engaged as a legitimate supplier of DME, and therefore, acts of mail fraud are essential in order for RGV Equipment to function. Furthermore, the intricate planning required to

carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Rogov and John Doe Defendant "1" continue to attempt collection on the fraudulent billing submitted by RGV Equipment to the present day.

464.    RGV Equipment is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by RGV Equipment in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

465.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $60,000.00 pursuant to the fraudulent bills submitted through RGV Equipment.

466.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### TWENTIETH CAUSE OF ACTION
**Against RGV Equipment, Rogov, and John Doe Defendant "1"**
**(Common Law Fraud")**

467.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

468.    RGV Equipment, Rogov, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

469.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that RGV Equipment had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact RGV Equipment was not lawfully

licensed as they knowingly falsified the business address and owner information on their application for a Dealer in Products; (ii) the representation that that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; (iii) the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) the representation that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) the representation that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO, to the extent that any Fraudulent Equipment was actually provided; and (vi) the representation that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount.

470. RGV Equipment, Rogov, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through RGV Equipment that were not compensable under New York no-fault insurance laws.

471. GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by

reason of the above-described conduct in that it has paid at least $60,000.00 pursuant to the fraudulent bills submitted by RGV Equipment, Rogov, and John Doe Defendant "1".

472.    RGV Equipment, Rogov, and John Doe Defendant "1"'s extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

473.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**TWENTY-FIRST CAUSE OF ACTION**
**Against RGV Equipment, Rogov, and John Doe Defendant "1"**
**(Unjust Enrichment)**

474.    GEICO incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

475.    As set forth above, RGV Equipment, Rogov, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

476.    When GEICO paid the bills and charges submitted by or on behalf of RGV Equipment for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

477.    RGV Equipment, Rogov, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that RGV Equipment, Rogov, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

478.    RGV Equipment, Rogov, and John Doe Defendant "1"'s retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

479.     By reason of the above, RGV Equipment, Rogov, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $60,000.00.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.      On the First Cause of Action against All City Supply, Irbo Supply, Easy Way Supply, Soan Supply, XL Supply, and RGV Equipment, for a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that All City Supply, Irbo Supply, Easy Way Supply, Soan Supply, XL Supply, and RGV Equipment, have no right to receive payment for any pending bills submitted to GEICO;

B.      On the Second Cause of action against the Paper Owner Defendants and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but more than $761,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.      On the Third Cause of Action against the Paper Owner Defendants and the John Doe Defendants for compensatory damages in favor of GEICO in an amount to be determined at trial but more than $761,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against Kaplan and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but more than $89,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

E.      On the Fifth Cause of Action against All City Supply, Kaplan, and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $89,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Cause of Action against All City Supply, Kaplan, and John Doe Defendant "1" for more than $89,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

G.      On the Seventh Cause of Action against Bogdanova and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but more than $373,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

H.      On the Eighth Cause of Action against Irbo Supply, Bogdanova, and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $373,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

I.      On the Ninth Cause of Action against Irbo Supply, Bogdanova, and John Doe Defendant "1" for more than $373,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

J.      On the Tenth Cause of Action against Satanovskyy and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but more than $101,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

K. On the Eleventh Cause of Action against Easy Way Supply, Satanovskyy, and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $101,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

L. On the Twelfth Cause of Action against Easy Way Supply, Satanovskyy, and John Doe Defendant "1" for more than $101,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

M. On the Thirteenth Cause of Action against Ishaq and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but more than $67,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

N. On the Fourteenth Cause of Action against Soan Supply, Ishaq, and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $67,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

O. On the Fifteenth Cause of Action against Soan Supply, Ishaq, and John Doe Defendant "1" for more than $67,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

P. On the Sixteenth Cause of Action against Kletsova and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but more than $69,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

Q.     On the Seventeenth Cause of Action against XL Supply, Kletsova, and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $69,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

R.     On the Eighteenth Cause of Action against XL Supply, Kletsova, and John Doe Defendant "1" for more than $69,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

S.     On the Nineteenth Cause of Action against Rogov and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but more than $60,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

T.     On the Twentieth Cause of Action against RGV Equipment, Rogov, and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $60,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

U.     On the Twenty-First Cause of Action against RGV Equipment, Rogov, and John Doe Defendant "1" for more than $60,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated: June 3, 2024
      Uniondale, New York

RIVKIN RADLER LLP

By: _/s/ Barry I. Levy_____

      Barry I. Levy
      Michael A. Sirignano
      Michael Vanunu
      Philip P. Nash
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*